**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| **In Re:** | **CASE NO. 24-21491** |
| **SLATER PARK, LLC,** *et al*, | **CHAPTER 11** |
| **Debtors.** | **SLATER HOSPITALITY EVENTS, LLC** |
| | **SLATER TOWER, LLC** |
| | **SLATER RESTAURANT, LLC** |
| | **SLATER HOSPITALITY, LLC** |
| | **Jointly Administered** |

**JOINT DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION**
**PROPOSED BY DEBTORS SLATER PARK, LLC, SLATER TOWER, LLC,**
**SLATER RESTAURANT, LLC, AND SLATER HOSPITALITY EVENTS, LLC**

## I.  INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") has been prepared pursuant to § 1125 of the United States Bankruptcy Code (the "**Bankruptcy Code**") on behalf Slater Park, LLC ("**Park**"), Slater Tower, LLC ("**Tower**"), Slater Restaurant, LLC ("**Restaurant**"), and Slater Hospitality Events, LLC ("**Events**") (Park, Tower, Restaurant, and Events are collectively "**Debtors**") in connection with Debtors' solicitation of votes for their Joint Plan of Reorganization dated June 23, 2025 [Doc. No. 123] (the "**Plan**"). It contains important information about Debtors and the Plan.[1]

In providing this Joint Disclosure Statement to parties in interest, Debtors expressly seek to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Disclosure Statement contains a summary of the Plan, general information about Debtors and their Chapter 11 cases, and important information concerning Debtors' current financial conditions and future prospects.

The information contained herein has been prepared by Debtors in good faith, based upon information available to Debtors.  The financial information contained herein all was compiled from the records of Debtors but has not been verified by an audit.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed contemporaneously herewith.  Each creditor is encouraged to read, consider, and carefully analyze the terms and provisions of the Plan.

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or equity interests.

## II.   BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE

Under Chapter 11 of the Bankruptcy Code, a debtor is afforded its opportunity to rehabilitate and to restructure its financial obligations to its creditors.

In general, a debtor files a "Chapter 11 Plan," which sets forth a proposal for settlement of the debtor's debts.  A debtor's debts are classified as either being secured or unsecured, depending on whether the debtor has pledged any of its property to the creditor as collateral for the debt, or if any creditors hold judgment liens against the debtor's property.

A debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments up to the value of the debtor's interest in the debtor's property. A debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

The Bankruptcy Code requires that certain unsecured debts receive priority in payment over other debts.  Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11 case, certain wages and employee benefits, certain consumer obligations, and taxes.

The Bankruptcy Code requires that a plan propose full cash payment to all priority unsecured creditors except taxing authorities.  Taxes under the Bankruptcy Code may be paid over time in installments.  Unsecured creditors may receive payments of anywhere from 0% to 100% of their claims, in a lump sum or over time, and the percentage and timing of payments depends on many factors and varies widely from case to case.

In any event, unless the creditors agree differently, a plan must provide creditors with at least the same treatment that creditors would receive in a liquidation of the debtor's assets under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code requires that the debtor (or other plan proponent) file a plan with the Court, which will be accompanied by a disclosure statement.  The disclosure statement must contain a summary of the plan and sufficient information about Debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or against the plan.

After the plan and disclosure statement are filed, the Court may hold a hearing on the adequacy of the disclosure statement or, in a small business case, may conditionally approve the disclosure statement, with final approval to be heard at the same time as confirmation of the plan. If the Court determines that the disclosure statement makes proper disclosures, then it is approved (or conditionally approved as the case may be), and the plan and disclosure statement, along with a ballot, are mailed to creditors and equity security holders for voting.

Typically, a date is set by the Court as the last day votes may be counted.  The Court also schedules a confirmation hearing, at which time the Court hears evidence as to whether the plan complies with various standards for confirmation under the Bankruptcy Code, including whether sufficient votes have been cast accepting the plan from classes of creditors whose rights have been "impaired" by the plan (*i.e*., creditors not receiving precisely the same rights they were entitled under their contracts with the debtor). Only ballots that are properly submitted are counted, so if a creditor does not vote, they are simply not counted in either the acceptance or rejection tallies.

There are two ways that a plan may be confirmed by the Court.  First, the plan may be confirmed if all the impaired classes vote to accept the plan, with a simple majority in number of creditors in the impaired class voting to accept, but they must also hold claims totaling at least 2/3 of the value of all the claims in that class that voted.

Alternatively, if a class of impaired creditors does not accept the plan, then the plan may still be confirmed if it is "fair and equitable" respecting such class.  The Bankruptcy Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any compensation under the plan.  Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim.  When a Court confirms a plan notwithstanding the lack of acceptance of all impaired classes, it is said that the debtor has achieved a "cramdown" of the plan.

When a debtor's plan is confirmed, the debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding and applies even to creditors who voted against the plan.

### III.   <u>BACKGROUND CONCERNING DEBTORS</u>

### A.  Pre-Bankruptcy History of Debtors

Debtors are affiliated entities that are part of a hospitality group that owns and operates restaurants, amusements, bars, and event space on the rooftop of Ponce City Market commonly known as Skyline Park, Nine Mile Station, RFD Social, and the Terrace since 2018 (the "**Businesses**").  Park operates Skyline Park which consists of two bars and interactive amusements. Restaurant operates Nine Mile Station which is a full-service restaurant. Events operates its business on the Terrace which hosts weddings and corporate events and an ice skating rink in the winter. Tower operates RFD Social which is a high-end cocktail bar with interactive games.

Mandy and Kelvin Slater (the "**Slaters**") are members of each of Debtors and the chief financial officer of each of Debtors is Brett Hull-Ryde ("**Hull-Ryde**"), but he is not a member of any of Debtors.   The Slaters and Hull-Ryde are each a member of Slater Hospitality, LLC ("**Hospitality**").

Slater Hospitality Management Services, LLC ("**Management**") is the parent company of Park, Tower, Restaurant, Events, and Hospitality. The Slaters and Hull-Ryde are the members of Slater Hospitality Management Services, LLC.

Prior to filing the bankruptcy cases, the five entities operated under a centralized cash management system. Each entity would deposit revenue into an account managed by Management. Management would then pay certain common expenses of the operating entities. The executive team that manages and oversees the Businesses is made up of seven directors: Director of Operations, Director of Engineering, Director of Accounting, Director of Beverages, Director of Media (Amanda Slater), Chief Executive Officer (Kelvin Slater), and Chief Financial Officer (Brett Hull-Ryde). Amanda Slater and Kelvin Slater and Brett Hull-Ryde each receive a gross monthly salary of $9615.38.

Park has approximately 75 hourly employees and Restaurant has 67. These employees also work for Tower and Events.

Hospitality does not operate a business. It is an affiliated entity, does not generate income or expenses, and is the guarantor of certain Small Business Administration loans and Ameris Bank loan for Slater Westside, LLC.  It also entered into that certain Deferred Payment Agreement with Choate Construction Company (the "**Choate Agreement**") for which it did not receive any consideration.

The Debtors do not own the Premises as defined below, but lease the Premises from JAMESTOWN Ponce City Market, L.P. ("**Jamestown**").

Jamestown and Park and Restaurant entered into a certain Rooftop Site Lease Agreement dated on or about March 31, 2016, as subsequently amended by the First Amendment to Rooftop Site Lease Agreement dated on or August 8, 2016, that Second Amendment to Rooftop Site Lease Agreement dated on or about May 19, 2017, and that Third Amendment to Rooftop Site Lease Agreement dated on or about May 22, 2018 (together, the "**Rooftop Lease**"). The Rooftop Lease covers the premises that are commonly known as and operate under the names Skyline Park and Nine Mile Station.

Jamestown and Events LLC entered into a certain Ponce City Market Tower Lease Agreement dated on or about May 19, 2017, as subsequently amended by the First Amendment dated on or May 22, 2018 (together, the "**Tower Lease**"). The Tower Lease covers the premises that is also known as and that operates under the name "**RFD Social**."

Jamestown and Events entered into a certain PoncCity Market Rooftop Site Lease Agreement dated on or about May 19, 2017 (the "**Terrace Lease**"). The Terrace Lease covers the premises that is known as and that operates under the name "**The Terrace**."

Jamestown and Events entered into a certain License Agreement dated on or about May 31, 2018 (the "**Office License**"). The Office License covers certain office space located at Suite E189 in the PCM retail market.

Tower also operates the Tower Restaurant on the Rooftop at Ponce City Market, but it is not a tenant under a lease with Jamestown.

The Rooftop Lease, the Tower Lease, the Terrace Lease, and the Office License are collectively referred to as the "**Leases**."  The premises subject to the Leases at which Debtors operate their Business shall be referred to as the "**Premises**."

Park, Tower, Restaurant, and Events each obtained secured disaster loans from the Small Business Administration as follows: Park – Loan 7210 on May 5, 2020 in the amount of $500,000; Tower – Loan 8005 on June 25, 2020 in the amount of $150,000; Restaurant – Loan 8010 in the amount of $150,000; and Events – Loan 8203 on August 28, 2020 in the amount of $150,000. Each of these loans is current and will continue to be paid according to their terms under the Plan.

Debtors also guaranteed Hospitality's SBA guaranteed loan from Truist Bank received by Hospitality on May 21, 2018. This loan is paid in full.

The Slaters developed another business in the Atlanta Westside community that was known as "LOA" that was owned by Slater Westside, LLC.  LOA was a member club with a roof top pool with bars outside and inside. The Slaters, Hull-Ryde, and Hospitality guaranteed the debt incurred to develop LOA. The two secured lenders are Ameris Bank and the Small Business Administration with Ameris Bank having the first priority security interest in and to the Slater Westside, LLC assets and with regard to assets pledged by the Slaters.

The Slaters pledged their real property as security for the Ameris Bank loan and for the Small Business Administration loan.  Hull-Ryde provided a guaranty to the Small Business Administration but did not pledge any security for the guaranty. The Small Business Administration filed a UCC-1 declaring an interest in all personal property owned by Hospitality that purportedly secures Hospitality's guaranty. Hospitality has only one asset, which is its member interest in a limited liability company unrelated to Debtors' Business.

Park, Tower, Restaurant, and Events are not guarantors of the Slater Westside, LLC LOA debt.

LOA was not successful for a number of reasons and the business closed soon after opening. Slater Westside, LLC was unable to repay the loans.  In November 2024, the Small Business Administration declared its intent to call the guaranties held by the Slaters, Hull-Ryde, and Hospitality.

During this same period, Events, Park, and Restaurant were not current on their payments due under the Leases based upon a dispute between Debtors and Jamestown regarding certain

construction at Ponce City Market. Jamestown was threatening action based upon the delinquent payments regardless of the dispute.

On November 22, 2024, Park, Tower, Restaurant, and Events filed their bankruptcy cases when Jamestown indicated that it might proceed to take possession of the Premises from them.

On November 26, 2024, Hospitality filed its bankruptcy case when the Small Business Association sent notices that it intended to send to the United States Treasury Department the loans Hospitality had guaranteed for Slater Westside, LLC.  These loans totaled over $5 million, and the Ameris Bank guaranteed loan totaled over $6.9 million. Based upon Hospitality's debts and lack of assets, it is filing a separate plan and disclosure statement as the Small Business Administration and Ameris Bank claims are substantially different from the claims in the Park, Tower, Restaurant, and Events bankruptcy cases.

Hull-Ryde and the Slaters each filed personal bankruptcy cases under Chapter 11 in November 2025.

**B.  Post-Bankruptcy Activities of Debtors.**

Since filing the bankruptcy cases on November 22, 2025, Debtors have continued to operate their Businesses. Debtors each filed their Schedules and Statement of Financial Affairs on December 16, 2024: in their individual cases Park [Doc. No. 35]; Restaurant [Doc. No. 33]; Tower [Doc. No. 29]; and Events [Doc. No. 28].

On November 27, 2024, the Bankruptcy Court entered the Order Authorizing and Directing the Joint Administration of Debtors' Chapter 11 Cases for Procedural Purposes Only, allowing for the joint administration of Debtors' cases [Doc. No. 20]. On December 18, 2024, the Bankruptcy Court entered an amended joint administration order allowing Hospitality to also be jointly administered [Doc. No. 38].

During the course of the jointly administered cases, Debtors paid their individual unsecured creditors in full and paid Truist Bank in full.  If these creditors do not withdraw their proofs of claim before the confirmation hearing on the Plan, Debtors will file objections to the claims.

Debtors' individual Small Business Administration loans are current and will continue to be paid under the terms of each loan agreement. The Internal Revenue Service, Georgia Department of Revenue, and Georgia Department of Labor filed priority unsecured claims. The Internal Revenue Service also filed general unsecured claims in each of Debtors' cases. Debtors dispute these claims and are working with each agency to resolve them.

Choate Construction Company ("**Choate**") filed 12 claims over Debtors' cases and Hospitality's case in the amount of $703,806.56 based upon a Deferred Payment Agreement executed by Hospitality (the "**Choate Agreement**"). Debtors are not parties to the Choate Agreement. Hospitality executed the Choate Agreement but did not receive any consideration for entering into it.  The Slaters were members of Slater 219, LLC. Slater 219, LLC entered into an

agreement with Choate to build out an eatery known as Pizza Clementine in a projected being developed by Newport and paid for by Newport located at 219 Mitchell Street in Atlanta. Newport was obligated to pay Choate. Newport failed to pay and walked away from the development. Both Slater 219, LLC and Choate suffered significant losses because of Newport's abandonment. Each of Debtors filed objections to Choate's claims. Debtors are not parties to the Choate Agreement. \ None of these Debtors were involved with the Mitchell Street project or obligated on any contract or loan documents.  Choate is, if anything, an unsecured creditor of Hospitality and its plan of reorganization will address Choate's claim.

During the pendency of the bankruptcy cases, Park, Restaurant, and Events assumed the Leases with Jamestown under the terms of a Letter Agreement which the Court approved [Doc. No. 109]. Pursuant to the terms of the Letter Agreement, the Leases are extended for a five-year period from October 2026. The arrearage under the Leases will be paid overtime as follows: $1,562,729.90 shall be paid over eighteen (18) equal installments in the amount of $86,818.33. The remaining $500,000 will be forgiven if Park, Restaurant, and Events meet certain benchmarks and make certain improvements to the Premises.  Any uncured default under the Letter Agreement or the Leases will result in Debtors immediate turnover of the Premises to Jamestown as more fully described in the Letter Agreement. A true and correct copy of the Letter Agreement is attached hereto as **Exhibit A**.

The Slaters will retain their member interests in Park, Tower, Restaurant, and Events after confirmation of the Plan. They will retain their salaried positions with Debtors.  Hull-Ryde will retain his member interest in Hospitality, which is filing its own plan of reorganization. He also is retaining his position as the chief financial officer with Debtors upon Plan confirmation. The Slaters and Hull-Ryde are the executive leadership team for Debtors. Their continued leadership is necessary to Debtors' successful reorganization.  Hull-Ryde receives $ per month as his gross salary. Kelvin Slater receives $ per month as his gross salary. Amanda Slater receives $ per month as her gross salary.

The Budget of projected income and expenses for July 2025 through July 2026 is attached as **Exhibit B** and incorporated herein by reference supports a successful and feasible reorganization (the "**Budget**").

### C.  Plan Distributions.

The Plan provides for one class of unsecured creditors:  Class 3 consists of the General Unsecured Creditors. Debtors assert that the only general unsecured creditors in this class are Allowed Unsecured Claims of taxing authorities that will be paid over twenty-four (24) months from Debtors' net revenue in twenty-four monthly payments beginning on the last day of the first month following the Effective Date.  These unsecured creditors, if any, will be paid from Debtors' net revenue.

Class 1 consists of the United States Small Business Association (the "**SBA**") Allowed Secured Claims of SBA which shall be paid from Debtors' income according to the terms of the respective loan documents.

Class 2 consists of the Allowed Arrearage Claim of Jamestown which shall be paid from Debtors' income according to the terms of the Letter Agreement and the Plan. If a conflict arises between the Plan and the Letter Agreement, the Letter Agreement shall control.

Class 3 consists of the Allowed General Unsecured Claims which shall be paid from Debtors' income according to the terms of the Plan. Debtor asserts that the only possible unsecured claims are those of the taxing authorities, if any.

Class 4 consists of the Disputed Unsecured Claim of Choate to which Debtors have filed objections. Debtors' Plan provides for no distribution to Choate.

Class 5 consists of the Equity Holders who will not receive any distributions under the Plan but will retain their employment positions with Debtor and shall continue to receive salaries as follows:  Further, Slaters shall retain their member interests in Debtors and Hospitality. Hull-Ryde shall retain his member interest in Hospitality.  The Slaters own 100% of the member interests in Park, Tower, Restaurant, and Events.  Hull-Ryde owns a 19% member interest in Hospitality and the Slaters each own a 40.5% member interest in Hospitality.

## IV.   SUMMARY OF THE PLAN

The Plan provides for the treatment of all secured, priority, and general unsecured claims, and retention of equity interests of Debtors as set forth below:

### A.   Priority Claims

The Plan provides for the satisfaction of all allowed administrative claims on the Effective Date, unless otherwise agreed by the holder of such claim. As to each administrative claim allowed thereafter, payment will be made as soon as practicable.

All tax priority claims, if any, shall be paid in accordance with § 1129 of the Bankruptcy Code. Any secured tax claim shall be paid in accordance with the Bankruptcy Code.

### B.   Secured Claims

**Class 1.   Allowed Secured Claims of the Small Business Administration ("SBA Allowed Secured Claims")**

Class 1 shall consist of the Allowed Secured Claims of the SBA. Tower, Restaurant, and Events each received a secured disaster loan from the SBA in the principal amount of $150,000. Park received a secured loan from the SBA in the principal amount of $500,000. The SBA asserts a security interest in each of Debtors' all tangible and intangible personal property pursuant to the UCC-1s recorded against Debtors as follows:  Park – UCC-1 recorded on May 8, 2020; Tower –

UCC-1 recorded on July 10, 2020; Restaurant – UCC-1 recorded on June 26, 2020; and Events – UCC-1 recorded on June 26, 2020. Each of the SBA loans has a 30-year term at 3.75% interest.

C.      **Unsecured Claims**

**Class 2.    Allowed Arrearage Claim of Jamestown (the "Jamestown Allowed Arrearage Claim")**

Class 2 consists of the Jamestown Allowed Arrearage Claim. Jamestown is the Landlord of Park, Restaurant, and Events with Park, Restaurant, Tower, and Events doing business in and on the Ponce City Market Rooftop.  Under the terms of the Letter Agreement between Jamestown and Restaurant, Park, and Events, Jamestown is to be paid $1,562,729.90  for the arrearage due under the Leases which shall be paid over eighteen (18) equal installments in the amount of $86,818.33. The Letter Agreement was approved by the Court and the Leases assumed. [Doc. No. 109]. The Letter Agreement is attached hereto as Exhibit A and is incorporated herein by reference. Should any conflict arise between the Plan and the Letter Agreement, the terms of the Letter Agreement control.

**Class 3.    General Unsecured Creditors (the "GUCs")**

Debtors believe that the only general unsecured creditor claims, if it at all, may be the general unsecured claims of Internal Revenue Service. The Schedules and Statement of Financial Affairs filed on December 16, 2024 for Park [Doc. No. 35], Tower [Doc. No. 29], Restaurant [Doc. No. 33], and Events [Doc No. 28] listed unsecured creditors but Debtors have paid these creditors in full during the course of the bankruptcy cases. Those unsecured creditors who filed proofs of claim in each case and have been paid in full shall withdraw their proof of claim prior to the confirmation hearing on the Plan or Debtors shall object to the claims.

Any valid and allowed general unsecured claim or priority unsecured claim held by a taxing authority shall be paid as a Class 3 Claim.

Class 3 Claims, if any, shall be paid from Debtors' net revenue in twenty-four equal payments beginning on the last day of the first month following the Effective Date.

**Class 4.      Disputed Unsecured Claim of Choate (the "Choate Disputed Claim")**

Choate filed multiple duplicate claims against Debtors and Slater Hospitality, LLC asserting an unsecured claim in the amount of $703,806.56. Park, Restaurant, Tower, and Events have each objected to Choate's proofs of claim.  If Choate has claim, the claim would be against Hospitality as a general unsecured claim. Hospitality also has objected to the Choate Disputed Claim. Choate also filed an unsecured claim in Hull-Ryde's bankruptcy case and Hull-Ryde has objected to this claim.

Class 4 shall not receive any distribution under the Plan.

-9-

### D.      Equity Interests

**Class 5.**    On the Effective Date of the Plan, the Slaters will retain their member interests in Debtors and will be the sole owners of Debtors. Hull-Ryde and Slaters hold member interests in Hospitality and will retain their respective interests. The Slaters and Hull-Ryde guaranteed the Slater Westside, LLC SBA loans and the Slaters also guaranteed the Ameris Bank loan. Kelvin Slater guaranteed the Park SBA loan.

### E.      Valuation of Assets and Collateral

Each of Debtors' assets and valuations consists of the following:

| | | |
|---|---|---|
| Events – | Premises fixtures; leasehold improvements | $152,472 |
| Restaurant - | Supplies, office equipment, leasehold improvements | $494,097 |
| Tower - | concessions equipment, leasehold improvements | $141,353 |
| Park - | music, concessions equipment | $184,226 |

Total:  $972,148

Under the terms of the Letter Agreement and Leases with Jamestown, Jamestown hold a security interest in and to the leasehold improvements which total $668,586.The SBA has a first priority security interest in all Debtors' Personal Property. Debtors do not own any unencumbered assets. Park, Restaurant, and Events Leases are controlled by Jamestown; thus, Park, Restaurant, and Events cannot market the Leases as an asset in the event of liquidation.

### F.      Funding for the Plan

Distributions and payments under the Plan, the SBA Loans and the Jamestown Arrearage Claim shall be paid from Debtors' revenue as indicated on the projected budget attached hereto as **Exhibit B**.

Debtors shall pay the GUCs, if any, from its net revenue. Debtors shall pay any priority tax claims from its net revenue. Debtors shall pay any secured tax claims from its net revenue.

Debtors' projected July 2025 through July 2026 monthly income and expenses is set forth in the Budget.

### G.      Absolute Priority Rule and New Value Exception

Under § 1129 of the Bankruptcy Code, plans must be "fair and equitable" in order to be confirmed. Section 1129(b)(2)(B)(ii) provides guidance as to what constitutes "fair and equitable." It includes a requirement that junior classes of creditors and equity holders cannot receive property

of a Debtors during a reorganization, unless all senior classes either are paid in full or vote to accept the plan. This requirement is commonly referred to as the absolute priority rule.

The "new value" doctrine is a common law exception to the absolute priority rule. The basic concept behind "new value" is that equity holders may retain their interest in a debtor when they provide contribution, often in the form of capital, to the reorganization. Generally speaking, for the "new value" exception to apply, the value provided must be substantial, necessary, and reasonably equivalent to the value of the interest received in exchange.

### H.      Cramdown

If not enough classes of creditors vote in favor of the Plan, Debtors will be requesting confirmation pursuant to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code with respect to any impaired Class that votes to reject the Plan.  Accordingly, upon confirmation by the Bankruptcy Court, the Plan will be binding on all creditors and Classes, even if they voted to reject the Plan.

### I.      Other Plan Provisions

Any executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed rejected on the Effective Date unless the Confirmation Order provides otherwise. Allowed Claims, if any, arising out of the rejection of executory contracts and unexpired leases shall be treated as Class 3 General Unsecured Claims, if not otherwise provided for with the consent of the parties and approval by the Bankruptcy Court.

**THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH HAS BEEN FILED CONTEMPORANEOUSLY HEREWITH.**

## V.  VOTING ON THE PLAN

Below is a summary of the Classes set forth in the plan and identification of which Classes are entitled to accept or reject the Plan:

**Class 1.**      **Allowed Secured Claims of the SBA– Unimpaired and not entitled to vote on the Plan.**

**Class 2.**      **Allowed Arrearage Claim of Jamestown – Impaired and entitled to vote on the Plan.**

**Class 3.**      **Allowed General Unsecured Claims   – Impaired and entitled to vote on the Plan.**

**Class 4.**      **Disputed Claim of Choate Construction Company –  Not entitled to vote on the Plan.**

**Class 5.**      **Equity Holders – Not entitled to vote on the Plan.**

## VI. DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, a debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditors hold liens. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of Debtors' estates, including the costs resulting from a Chapter 7 liquidation, and the adverse effect of a forced sale on the price of Debtors' assets, Debtors have determined that confirmation of the Plan will provide each holder of a claim with a recovery that substantially more than each such holder would receive in a liquidation of Debtors' assets under Chapter 7 of the Bankruptcy Code.

For Plan payments and this liquidation analysis, Debtors value their assets. Debtors' only assets are the personal property listed in the Schedules of Park, Tower, Restaurant, and Events. These assets consist of the concessions, fixtures, tables, chairs, and other items needed to operate their Businesses on the Rooftop (the "**Personal Property**"). The SBA has a first priority security interest in and to all Debtors' assets under the terms of its recorded and properly perfected UCC-1s. Also, under the terms of the Letter Agreement with Jamestown, Debtors gave Jamestown an interest in the personal property such that if Park, Restaurant, or Events default under the terms of the Letter Agreement that requires vacating the Premises, Jamestown may be entitled to retain the Debtors' Personal Property that either cannot be removed from the Premises and to which the SBA does not assert its interest. As a result, Debtors do not have any assets to liquidate other than the Leases and these may not be assigned without Jamestown's approval.  Therefore, in a Chapter 7 liquidation, a Chapter 7 Trustee would not have any assets to liquidate for distribution to creditors.

If assets did exist for liquidation, generally, assets disposed of by "liquidation" or "fire" sale generate significantly less proceeds than assets that are marketed and sold as a going concern. Additionally, a Chapter 7 Trustee would incur trustee's fees pursuant to § 326(a) or § 330 of the

-12-

Bankruptcy Code.[2] After payment of administrative and priority claims from Debtors' income, a Chapter 7 liquidation would diminish any cash remaining for distributions for any other creditors.

Debtors do not have any General Unsecured Creditors as Debtors have paid all in full during the pendency of the bankruptcy cases. The taxing authorities who filed proofs of claim and assert allowed unsecured claims will be paid in full over twenty-four (24) months.  Debtors have objected to the Choate unsecured claim and it will not receive any distribution under the Plan.

In a chapter 7 liquidation, the unsecured creditors would not receive any distribution. The Allowed General Unsecured Creditors, if any, will receive more under this Plan than they would receive under a Chapter 7 liquidation. Debtors believe that this satisfies the Best Interests Test.

## VII. ADMINISTRATIVE EXPENSE CLAIMS, INCLUDING ATTORNEYS' FEES AND UNITED STATES TRUSTEE FEES

With respect to potential Administrative Expense Claims, Debtors, pursuant to Court order, retained the law firm of Rountree Leitman Klein & Geer, LLC ("**RLKG**") to serve as bankruptcy counsel. As set forth in the employment application and supporting documents, RLKG received prepetition retainers from Debtors as follows:  Park $30,000; Tower $30,000; Restaurant $30,000; and Events $30,000.  As of the date hereof, the fees and expenses incurred by RLKG have exceeded the retainer for Park and Events. Further, RLKG shall file a final application for compensation as soon as practicable after the order confirming the Plan is entered. Debtors shall pay any unpaid Administrative Expense Claim approved by the Court and held by RLKG as agreed upon between Debtors and RLKG. RLKG shall retain its security interests in its pre-petition retainers.

All fees required to be paid by 28 U.S.C. § 1930(a)(6) ("**U.S. Trustee Fees**") will accrue and be timely paid until the Bankruptcy Case is closed. Debtors are current on their obligation to pay U.S. Trustee Fees and any unpaid U.S. Trustee Fees owed on or before the Effective Date shall be paid in full on the Effective Date.

## IX.  LITIGATION; BANKRUPTCY CAUSES OF ACTION; AND RECOVERY OF ASSETS

---

[2] 11 U.S.C. § 326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000 of Liquidation Value of Assets; 10% of amount in excess of $5,000 but not in excess of $50,000 of Liquidation Value of Assets; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; 3% of any amount in excess of $1,000,000 of the Liquidation Value of Asset, and commissions for auctioneers for personal property generally is equivalent to ten (10%) percent of the gross sales price and commissions for real property brokers is generally six percent (6%) of the gross sales price.  In addition, the attorney for the Chapter 7 trustee would incur attorney's fees as would the current Chapter 11 attorneys.

11 U.S.C. § 330 provides for reasonable compensation for actual, necessary service rendered by the trustee and reimbursement for actual, necessary expenses.

Debtors know of no litigation which will be instituted and/or continued against any party following confirmation of the Plan, except for routine claim objections which may be instituted against claimants whose claims may be disputed by Debtors.

## X.  INFORMATION RELEVANT TO THE RISKS POSED TO CREDITORS UNDER THE PLAN

The primary risk to creditors in this case is that Debtors will not receive the estimated income and will not be able to make the proposed payments under the Plan. However, Debtors believes that this is a minimal risk. Although it is impossible to predict any unforeseen contingencies, Debtors anticipates payment to creditors within the timeframe contemplated in the Plan.

## XI.  FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

Debtors are not aware of any adverse federal or state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against Debtors as a bad debt.

**However, Debtors do not warrant that there will be no tax implications to creditors resulting from confirmation of the Plan, and creditors should not rely on Debtors representations regarding potential tax consequences. Creditors are well-advised to consult their tax advisors as to whether confirmation of the Plan could cause any adverse tax implications.**

The U.S. federal income tax consequences to a holder of a Claim (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (a) the manner in which you acquired a Claim; (b) the length of time that you have held the Claim; (c) whether you acquired the Claim at a discount; (d) whether you have taken a bad debt deduction with respect to the Claim (or any portion thereof) in current or prior years; (e) whether you have previously included in taxable income accrued but unpaid interest with respect to the Claim; and (f) your method of accounting.

## XII.  DISCLAIMER

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY OTHER SECURITIES REGULATORY AUTHORITY NOR HAS THE SEC OR ANY OTHER

SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS, ITS ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF

-15-

OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTORS WILL NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SEC OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, SHOULD BE READ IN ITS ENTIRETY.  ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.

NO REPRESENTATIONS CONCERNING THE DEBTORS, ITS FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITIONS, OR THE VALUE OF ITS PROPERTY ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.

## XIII.  CONCLUSION

In the opinion of Debtors, the Plan is the best available option for creditors because it will provide the greatest and quickest distributions to all creditors.

Dated: June 23, 2025

**ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Ceci Christy*_____
Ceci Christy
Ga. Bar No. 370092
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
cchristy@rlkglaw.com
*Attorneys for*
*Slater Park, LLC, Slater Tower, LLC*
*Slater Restaurant, LLC, and*
*Slater Hospitality Events, LLC*

EXHIBIT A

## LETTER AGREEMENT

**THIS LETTER AGREEMENT** (this "**Letter Agreement**") is made and entered into this 1st day of May 2025 (the "**Effective Date**"), by and among **JAMESTOWN PONCE CITY MARKET, L.P.**, a Delaware limited partnership, whose address is 675 Ponce de Leon Avenue NE, 7th Floor, Atlanta, Georgia 30308, being duly authorized for the purposes hereof ("**Landlord**") and **SLATER RESTAURANT, LLC**, a Georgia limited liability company, and **SLATER PARK, LLC**, a Georgia limited liability company, jointly and severally (collectively, "**Rooftop Tenant**"), and **SLATER HOSPITALITY EVENTS, LLC**, a Georgia limited liability company ("**Tower/Terrace Tenant**" or "**Office Licensee**").

**WHEREAS**, Landlord and Rooftop Tenant are parties to that certain Rooftop Site Lease Agreement, dated March 31, 2016, as amended by that certain First Amendment to Rooftop Site Lease Agreement dated August 8, 2016, that certain Second Amendment to Rooftop Site Lease Agreement dated May 19, 2017, that certain Third Amendment to Rooftop Site Lease Agreement dated May 22, 2018, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Rooftop Lease**"), relating to certain rooftop space (as more particularly described in the Rooftop Lease) located at Ponce City Market located at 675 Ponce de Leon Avenue NE, Atlanta, Georgia 30308 (the "**Project**");

**WHEREAS**, Landlord and Tower/Terrace Tenant are parties to that certain Ponce City Market Tower Lease Agreement dated May 19, 2017, as amended by that certain Amendment No. 1 to Ponce City Market Tower Lease Agreement, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Tower Lease**"), relating to certain tower space (as more particularly described in the Tower Lease) at the Project;

**WHEREAS**, Landlord and Tower/Terrace Tenant are parties to that certain Ponce City Market Rooftop Site Lease Agreement dated May 19, 2017, as amended by that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Terrace Lease**"), relating to certain rooftop terrace space (as more particularly described in the Terrace Lease) at the Project;

**WHEREAS**, Jamestown PCM Master Tenant, L.P., as "Licensor", and Office Licensee are parties to that certain License Agreement dated May 31, 2018, as amended by that certain Amendment No. 1 to Ponce City Market Tower Lease Agreement, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated

1

#232521v19

Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Office License**"), relating to certain office space (as more particularly described in the Office License) at the Project;

**WHEREAS**, the Rooftop Lease, the Tower Lease, and the Terrace Lease are collectively referred to as the "**Rooftop Leases**";

**WHEREAS**, the Rooftop Lease, the Tower Lease, the Terrace Lease and the Office License are, unless context dictates otherwise, collectively referred to as the "**Leases**";

**WHEREAS**, Rooftop Tenant, Tower/Terrace Tenant and Office Licensee are, unless context dictates otherwise, individually and collectively referred to as "**Tenant**";

**WHEREAS**, Landlord and Jamestown PCM Master Tenant, L.P. are, unless context dictates otherwise, individually and collectively referred to as "**Landlord**";

**WHEREAS**, the spaces leased by Tenant under the Rooftop Leases and the space licensed by Office Licensee under the Office License are, unless context dictates otherwise, collectively referred to as the "**Premises**";

**WHEREAS**, pursuant to the Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, Landlord and Tenant agreed, among other things, to defer payment of $253,297.08 in Rent owed under the Rooftop Lease, the Tower Lease and the Terrace Lease for the months of January and February 2021 (the "**Deferred Rent**"), with the Deferred Rent to be paid to Landlord in monthly installments of $21,024.94, due and payable on the first (1st) day of each calendar month commencing on October 1, 2025 and continuing until the last payment is made on September 1, 2026, as also set forth in Exhibit A of this Letter Agreement;

**WHEREAS**, Tenant is in default of each Lease;

**WHEREAS**, on November 22, 2024, Tenants filed for chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Northern District of Georgia (Gainesville Division) and such cases remain pending and are jointly administered in Case. No. 24-21491-JRS (the "**Bankruptcy Proceeding**");

**WHEREAS**, Tenant owes Landlord $2,062,729.90 in pre-petition rent and other financial obligations past-due and owing under the Leases (the "**Rental Arrearage**"), not inclusive of late fees, interest or legal fees and costs; and

**WHEREAS**, Landlord and Tenant desire to make and enter into this Letter Agreement for the purpose of evidencing their mutual understanding and agreement regarding: (a) modification of Lease terms as explicitly set forth herein; (b) the extension of the terms of the Leases; (c) the amendment to consolidate and confirm Tenant's payment of Minimum Rent, Base Rent, Operations Rent, and Deferred Rent

2

#232521v19

(collectively, for purposes of this Letter Agreement, "**Rent**") under the Leases with strict compliance required; (d) the repayment of Tenant's Rental Arrearages; (e) the establishment of performance obligations for Tenant with respect to Tenant's businesses operated at the Premises; (f) amended and supplemented Landlord's default and recapture rights; and (g) certain other matters relating thereto as set forth below.

**NOW THEREFORE**, for and in consideration of the Premises, the keeping and performance of the covenants and agreements hereinafter contained, and for Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree to amend and supplement the Leases as follows:

1.      **Recitals; Defined Terms**.  The foregoing recitals are incorporated herein and are made a material part of this Letter Agreement.  Unless otherwise defined herein, all capitalized terms shall have the respective meanings ascribed thereto in the Leases, as applicable.

2.      **Leases in Effect; Conflicts**. This Letter Agreement shall be incorporated into and made part of the Leases. Except as provided herein, all other terms and conditions of the Leases shall remain unchanged and in full force and effect and are hereby ratified and confirmed by Landlord and Tenant. In the event of any inconsistency or conflict between the terms of this Letter Agreement and of the Leases, the terms of this Letter Agreement shall control.

3.      **Extension of Term**. Landlord and Tenant hereby extend the Term of each of the Leases for an additional sixty (60) months, commencing on November 1, 2026, and expiring on October 31, 2031 (said sixty (60) month extension is referred to herein as the "**Extended Term**"), unless sooner terminated in accordance with the terms of the Leases, as amended hereby.

4.      **Amended and Restated Rent Obligations under the Leases**. Landlord and Tenant agree that Tenant's Rent obligations under the Leases shall be amended as set forth in this Section.

(a)      **Collective Minimum Rent**. Tenant shall pay Minimum Rent under the Leases for use of the Premises as set forth in this Section 4(a). The sum of the Minimum Rent for the Leases shall be due and payable in monthly installments, in advance, on the first (1ˢᵗ) day of each calendar month. For the avoidance of doubt, "**Minimum Rent**" as used herein shall amend and restate Tenant's "Minimum Rent" payment obligations under the Rooftop Leases, and Tenant's "Base Rent" payment obligations under the Office License.

(i)      For each month during the Term and November and December of the Extended Term, the monthly installments of the Minimum Rent for the Leases are as set forth in Exhibit A of this Letter Agreement.

3

#232521v19

(ii)    For each month during the period beginning on January 1, 2027 and continuing through the expiration of the Extended Term, the monthly installments of the Minimum Rent for the Office License are as set forth below.

| Year | Monthly Minimum Rent – Office License |
|---|---|
| 2027 | $8,524.14 |
| 2028 | $8,779.86 |
| 2029 | $9,043.26 |
| 2030 | $9,314.56 |
| 2031 (Jan 1, 2031 – Oct 31, 2031) | $9,593.99 |

(iii)    For each month during the period beginning on January 1, 2027 and continuing through the expiration of the Extended Term, the monthly installments of the Minimum Rent for the Rooftop Leases are as set forth below.

| Year of Extended Term | Monthly Minimum Rent – Rooftop Leases |
|---|---|
| 2027 | $169,682.25 |
| 2028 | $175,606.08 |
| 2029 | $180,874.25 |
| 2030 | $186,300.50 |
| 2031 (Jan 1, 2031 – Oct 31, 2031) | $191,889.50 |

(b)    **Overage Rent**. Beginning on the Effective Date and continuing through the expiration of the Extended Term, in addition to the monthly Minimum Rent for the Rooftop Leases payable to Landlord pursuant to Section 4(a) above, for any calendar month (pro-rated for any partial calendar month) in which the amount that is ten percent (10%) of Tenant's Gross Revenues (as defined below), exceeds the amount which Tenant previously paid to Landlord as Minimum Rent for such month (in each instance, the "**Overage**"), Tenant shall pay to Landlord "**Overage Rent**" in accordance with this Section 4(b). Each monthly Overage Rent payment shall be due and payable within ten (10) calendar days following the last day of such calendar month. For the avoidance of doubt, "**Overage Rent**" as used herein shall amend and restate Tenant's "Operations Rent" payment obligations under the Rooftop Leases.

(i)    **Calculation of Overage Rent**. For any calendar month in which there is an Overage, the Overage Rent payment shall be equal to ten percent (10%) of the Gross Revenues for such month minus the Minimum Rent for such month.

(ii)    **Payment of Overage Rent; Reporting Gross Revenues**. Within ten (10) days following the last day of each calendar month, Tenant shall submit to Landlord a statement itemizing and showing in reasonable detail Tenant's Gross Revenues (a "**Statement**"). If in a calendar month, there is an Overage, Overage Rent for such calendar month shall be due and payable by Tenant to Landlord within ten (10) calendar days following the last day of such calendar month, and the applicable Statement shall be accompanied by Tenant's payment of Overage Rent for that calendar month. For example, if the monthly Gross Revenues in January 2027 equal $1,800,000.00, then for January 2027 there would be an

4

#232521v19

Overage, and the Overage Rent would be $10,317.75, and Tenant would be required to remit payment of January 2027's Overage Rent no later than February 10, 2027.

(iii)   **Inspection of Tenant's Books and Records**. Landlord shall have the right, upon not less than five (5) days' prior written notice, during Tenant's customary business hours and at Tenant's principal office location to audit the books and records of Tenant pertaining to Gross Revenues, Overage, Overage Rent and Statements. On request of Landlord, Tenant shall make all information pertaining to all Operations available for examination at the Premises. If Landlord shall have such an audit made, and Tenant's Gross Revenues shall be found to be understated by more than four percent (4%), then Tenant shall be in default under this Letter Agreement and Landlord may elect to enforce any of its available remedies, including termination of the Leases and recapture of the Premises. In any event, Tenant shall promptly pay to Landlord any deficiency in Overage Rent plus interest at the Default Rate from the date such payment should have been made to the date of payment. Such examination and audit may be made by Landlord or an accountant as designated in writing by Landlord.

(iv)   **Gross Revenues Defined**. "**Gross Revenues**" shall mean the sum of any and all sales and revenues from the Premises including, without limitation, entrance fees, food and beverage sales, amusement fees, special events fees, ticket sales, corporate buy-outs, catering fees, bar fees, rental fees and sponsorship, advertising and promotions revenues, and in-kind donations made by Tenant.

(c)   **Other Monthly Payment Obligations**. Tenant acknowledges and agrees that the amended Minimum Rent obligations provided herein are in addition to Tenant's other payment obligations under the Leases and this Letter Agreement, including but not limited to the charges associated with real estate and other taxes payable by Landlord (other than net income taxes) that are directly attributed to the Premises, all operating costs in connection with Tenant's use and occupancy of the Premises, the HVAC Water Charge (as defined in the Office License), Deferred Rent (as set forth Exhibit A), and any other monthly financial obligations in the Leases. These payments shall be due and payable to Landlord on the first (1st) day of each calendar month. For the avoidance of doubt, this Letter Agreement does not limit or reduce Tenant's financial obligations under the Leases except as explicitly set forth in Section 5(b) of this Letter Agreement.

5.   **Repayment of Rental Arrearages**. Landlord and Tenant agree to the below repayment terms of the Rental Arrearage (collectively, the "**Repayment Obligation**"):

(a)   Tenant shall repay $1,562,729.90 of the Rental Arrearage in eighteen (18) equal monthly installments, each in the amount of $86,818.33, which shall be due and payable on the fifteenth (15th) day of each calendar month, beginning on May 15, 2025 through October 15, 2026 (the "**Repayment**

5

#232521v19

**Schedule**"). The monthly Repayment Schedule installments shall be paid to Landlord in the same manner as Tenant pays monthly Minimum Rent, strict compliance required with time of the essence.

(b)    Landlord and Tenant agree to the repayment or forgiveness, as applicable, of the remaining $500,000.00 of the Rental Arrearages in accordance with the terms of this Section 5(b):

(i)    Tenant shall provide to Landlord no later than September 1, 2025 a detailed plan of proposed improvements to the Premises for Landlord's approval. The plan shall include a description of the proposed improvements, depictions of the anticipated appearance of the Premises upon completion of the proposed improvements, estimated costs, a construction timeline, and contractor details as specified on Exhibit B to this Letter Agreement. Upon submission of a complete plan, Landlord shall have thirty (30) days to review the plan and either approve it or provide written comments and requested modifications. Tenant shall revise and resubmit the plan incorporating Landlord's feedback within fifteen (15) days of receiving such comments. The plan shall be deemed approved upon the earlier of: (x) Landlord's written confirmation of acceptance or (y) thirty-five (35) days after the initial submission if Landlord provides no written response to Tenant.

(ii)   Tenant shall install all approved improvements at the Premises, to Landlord's satisfaction, by March 31, 2026.

(iii)  Tenant shall receive a credit toward its Repayment Obligation for all approved and actually incurred improvement costs at the Premises, up to a maximum of $500,000.00, provided that such costs are expended on or before March 31, 2026, and Tenant submits to Landlord (a) valid permits, (b) lien waivers, (c) paid receipts, and (d) an affidavit of completion from the contractor or subcontractor for all such work. Any qualifying improvements meeting the requirements of this Section 5(b) shall be applied as a credit toward the Repayment Obligation, and the Landlord shall forgive an equivalent portion of the Rental Arrearage in the amount of such credit.

(iv)   For any remaining portion of the Rental Arrearage not forgiven pursuant to Section 5(b)(iii), Tenant shall pay to Landlord such portion no later than November 1, 2026, payable in the same manner as Tenant pays rent.

(v)    Notwithstanding anything to the contrary contained herein, any permitting delay, strike, lockout and/or labor dispute, such strike, lockout and/or labor dispute shall not excuse or delay the performance by Tenant as provided in this Section 5 and this Letter Agreement.

6

#232521v19

6. **Performance Obligations**. In addition to the payment of Rent and the performance of the Repayment Obligation, Tenant shall also comply with the following obligations concerning Tenant's operation of its businesses at the Premises (collectively, the "**Performance Obligations**"):

(a) **Business Plan**. Tenant shall provide to Landlord no later than June 30, 2025 a detailed business plan that outlines how Tenant will bring Gross Revenues at the Premises to at least $20,000,000 annually by the calendar year 2027. The business plan shall include, at a minimum: (i) a market analysis, (ii) capital improvements; (iii) revenue projections broken down by quarter with supporting assumptions, (iv) a marketing and sales strategy, including customer acquisition and retention plans, (v) an operational strategy, including staffing, supply chain management, and capital investments, and (vi) a timeline with measurable performance benchmarks. If requested by Landlord, upon reasonable notice to Tenant, Tenant shall present the business plan to Landlord in a formal meeting, either in person or via video conference, within [ten (10)] days of submission. Landlord shall review the business plan in good faith and provide written feedback, including any required revisions, within [fifteen (15)] business days of the presentation. Tenant agrees to reasonably cooperate and diligently revise the business plan as directed by the Landlord to address such feedback. The business plan shall be finalized and approved by the Landlord no later than August 15, 2025. In the event Landlord does not provide any written feedback on the timeline provided by this Section 6(a), Tenant's obligations under this Section 6(a) are deemed satisfied.

(b) **Monthly Meetings**. Tenant shall meet with Landlord monthly, upon Landlord's request and with reasonable notice to Tenant, to review Tenant's efforts with respect to increasing its Gross Revenues.

(c) **Minimum Gross Revenues Requirement**. In addition to Tenant's obligations under the Leases, Tenant must maintain minimum Gross Revenues during the Term, including the Extended Term, on 12-month basis in an amount equal to or greater than the applicable sum of the following quarterly benchmark amounts ("**Minimum Gross Revenues**"):

| Year | Q1 | Q2 | Q3 | Q4 |
|------|----|----|----|----|
| 2025 | $2,535,000 | $4,501,500 | $3,981,000 | $3,979,500 |
| 2026 | $2,661,750 | $4,726,575 | $4,180,050 | $4,178,475 |
| 2027 | $2,794,753 | $4,962,753 | $4,388,920 | $4,387,266 |
| 2028 | $2,934,685 | $5,211,236 | $4,608,671 | $4,606,935 |
| 2029 | $3,081,208 | $5,471,423 | $4,838,773 | $4,836,950 |
| 2030 | $3,235,336 | $5,745,114 | $5,080,818 | $5,078,903 |
| 2031 | $3,397,069 | $5,032,310 | $5,334,805 | $5,332,795 |

(d) **Landlord's Recapture Remedy for Tenant's Failure to Meet Minimum Gross Revenues**. Landlord may terminate Tenant's possessory interest in the Premises and any right asserted by Tenant to operate at the Premises upon written notice effective ninety (90) calendar days from the date of such notice with no opportunity to cure if Tenant fails to meet the Minimum Gross Revenues for any twelve (12) month period (in each instance, a "**Minimum Gross Revenues Default**"). Beginning on January 1, 2027 and through the remainder of the Term, including the Extended Term, Landlord may issue a Minimum Gross Revenues Default for any failure by Tenant to achieve Minimum Gross Revenues for any trailing

7

#232521v19

twelve (12) month period. The earliest twelve (12) month trailing measurement period for a Minimum Gross Revenue Default will be the 2026 calendar year. For the avoidance of doubt, the applicable twelve (12) month trailing period for a Minimum Gross Revenues Default may span calendar years.

7.    **Termination of Tenant's Right of Possession and Tenant's Obligation to Vacate the Premises**.

(a)    **Collective Effect Clause**. Tenant acknowledges and agrees that a material condition to the Landlord's willingness to execute this Letter Agreement is that Tenant agrees that Landlord's remedies for a Default, whether or not attributable to a particular Lease, will apply to all of the Leases and remedies will apply to all Premises. Tenant further expressly acknowledges and agrees that it hereby waives any claim or defense of any kind related to partial performance under the Leases or this Letter Agreement.

(b)    **Events of Default**. The following shall each be deemed to be a "**Default**" under this Letter Agreement and the Leases, time being of the essence, without any notice or cure period unless otherwise expressly stated:

(i)    Any part of the Rent required to be paid by Tenant under the Leases is not paid when due;

(ii)    Any part of the Repayment Obligation required to be paid by Tenant under this Letter Agreement is not paid when due;

(iii)    Any monthly Gross Revenues report required under this Letter Agreement is not submitted by Tenant when due;

(iv)    Any part of the Overage Rent required to be paid by Tenant under the Leases is not paid when due;

(v)    Tenant underreports its Gross Revenues on a Statement by more than four percent (4%);

(vi)    Tenant fails in the observance or performance of any of its Performance Obligations under this Letter Agreement, provided that any failure to meet the Minimum Gross Revenues requirement shall be subject to the terms of Section 6(d) of this Letter Agreement;

(vii)    Tenant fails to operate the Premises at any time without prior written approval of the Landlord, except for previously approved closures of Skyline Park and RFD Social on Mondays through Thursdays in January and February of each year and closures arising from weather conditions that prevent safe operations, as reasonably determined by Tenant;

8

#232521v19

(viii)    The Bankruptcy Proceeding is voluntarily or involuntarily dismissed and Landlord does not approve of the dismissal;

(ix)    If Tenant is cited for failure to comply with any federal, state, county, or municipal health and safety regulation that Tenant fails to cure within the time set forth in any such citation.

(x)    If Tenant or any of its principals (or Guarantors) commits, is convicted of, or pleads guilty or "nolo contendere" to a felony (or misdemeanor punishable by imprisonment for more than one year), a crime involving moral turpitude, or any other act, crime, or offense that Landlord reasonably believes is injurious to the Project;

(xi)    A lien is placed on the Premises resulting from any action or failure to act by the Tenant, the Tenant shall, within ten (10) days after notice from the Landlord, take all necessary steps to discharge such lien or encumbrance. If the Tenant fails to do so within the ten (10) day period, in addition to Landlord's default remedies, the Landlord shall have the right, but not the obligation, to pay the amount required to discharge the lien or encumbrance, and the Tenant shall immediately reimburse the Landlord for any such amounts paid; and

(xii)    Tenant fails in the observance or performance of any of its other covenants, agreements or conditions provided for in the Letter Agreement.

(c)    **Termination of Tenant's Rights of Possession and Tenant's Obligation to Vacate the Premises**. In addition to Landlord's default and termination rights under the Leases, should any Default occur, then the Leases and Tenant's rights of possession of the Premises granted thereunder will automatically terminate <u>without notice</u> upon the earlier of (i) the day the Default (other than a Minimum Gross Revenues Default and lien default) occurs, if there is no Cure Period (as defined in Section 7(d)), (ii) ten (10) calendar days after notice from the Landlord of a lien default; (iii) ninety (90) calendar days after Landlord sends to Tenant written notice of a Minimum Gross Revenues Default, or (iv) the day immediately following the expiration of the Cure Period without a cure of the Default, if there is a Cure Period. Contemporaneously with the termination of Tenant's right to possession of the Premises under the Leases, time being of the essence, Tenant must cease operations, vacate the Premises and deliver possession of the Premises to Landlord in the condition required by the Leases. Tenant acknowledges and agrees that returning the Premises to Landlord in the condition required under the Leases is a material consideration for this Letter Agreement. Tenant further acknowledges and agrees that all leasehold improvements to the Premises (including, without limitation, furniture, fixtures, equipment, Amusements, Games, and signs) shall become the property of Landlord upon expiration or earlier termination of the Lease, and Tenant shall not remove any such leasehold improvements from the Premises.

(d)    **Notice and Limited Opportunity to Cure Payment Defaults**. Upon the occurrence of a Default for Tenant's failure to pay Rent, Overage Rent, or a portion of the Repayment

9

#232521v19

Obligation when due (each, a "**Payment Default**"), Tenant shall have five (5) calendar days from the date Landlord sends written notice of the Payment Default to Tenant to cure such Payment Default (the "**Cure Period**"), provided however, that such opportunity to cure shall only be available to Tenant in the event that Tenant timely sent the applicable payment (and provides proof of same) and the Payment Default only occurred as a result of a delay caused by the bank(s) involved in the remittance of the payment, and provided further that there will only be one (1) Cure Period available to Tenant within any consecutive twelve (12) month period.

(e) **Security for Repayment**. As a material inducement for Landlord to enter into this Letter Agreement, contemporaneously with executing this Letter Agreement, Landlord and Tenant will execute Consent Orders which provide for Landlord to recapture the Premises in the event of the termination of Tenant's rights of possession of the Premises pursuant to Section 7(c) of this Letter Agreement.

(f) **Release by Tenant**. Except as hereinabove provided, all other terms and conditions of the Leases shall remain unchanged and in full force and effect and are hereby ratified and confirmed by Landlord and Tenant. Tenant, on behalf of itself and its successors, assigns, affiliates, owners, employees, agents, attorneys, and representatives, hereby acknowledges and agrees that, as of the Effective Date of this Letter Agreement, (i) the Leases are subject to no offsets, claims, counterclaims or defenses of any nature whatsoever; (ii) there are no defaults or breaches on the part of Landlord under the Leases, regardless of the giving of notice or the passage of time, or both, and (iii) all of Landlord's obligations accrued to date have been performed. Tenant, on behalf of itself and its successors, assigns, affiliates, owners, employees, agents, attorneys, and representatives, hereby releases Landlord, and each of its successors, assigns, affiliates, owners, employees, attorneys, insurers and representatives from any and all claims, demands, debts, disputes, judgments, liabilities, liens, rights and causes of action of any kind whatsoever, whether legal or equitable, whether contingent or non-contingent, and whether known or unknown, that arose or occurred on or before the Effective Date, including, but not limited to, all claims or counterclaims that could have been raised with respect to the Rental Arrearage, or that may have arisen in any way whatsoever from the Parties' relationship, the Leases, and/or the Premises. Tenant hereby ratifies the provisions of the Leases on behalf of itself and its successors and assigns and agrees to attorn and be bound to Landlord and its successors and assigns as to all of the terms, covenants and conditions of the Leases, as supplemented hereby. Tenant further agrees to fulfill all of its obligations under the Leases, as supplemented hereby, to Landlord throughout the remainder of the Term, including the Extended Term, of the Leases.

8. **Force Majeure**. Landlord and Tenant acknowledge and agree that Tenant's Minimum Gross Revenue Obligations constitute a monetary term, covenant, and condition under this Letter Agreement and the Leases. The Force Majeure provisions of the Rooftop Leases are amended to provide that if Tenant is delayed or prevented from performing its Minimum Gross Revenues monetary obligation under Section 6(c) of this Letter Agreement due to a Force Majeure Event (as defined below), Landlord's recapture remedy for Tenant's failure to meet Minimum Gross Revenues under Section 6(d) shall be extended by two months so that Tenant shall have a 14-month trailing period to measure Tenant's 12-month Minimum Gross Revenues (which is measured on a trailing basis). This 14-month trailing period to measure Tenant's 12-month Minimum Gross Revenues shall only apply if the Force Majeure Event occurred during the trailing twelve (12) month period serving as the basis for the Minimum Gross Revenues Default. A

10

#232521v19

"**Force Majeure Event**" means governmental laws or regulations not in effect as of the Effective Date, riots, terrorist acts, or government orders beyond the reasonable control of Tenant that prevent Tenant from operating the Rooftop Premises. Notwithstanding anything herein or in the Leases to the contrary, in no event shall a Force Majeure Event serve to (x) excuse the timely payment of Rent or any other financial obligation under this Letter Agreement and the Leases; or (y) limit Landlord's default, recapture and termination remedies except as explicitly provided in this Section 8.

9. **Authority**. The person executing this Letter Agreement on behalf of Tenant does hereby personally represent and warrant that: (a) Tenant is comprised of duly formed and validly existing limited liability companies; (b) Tenant is qualified to do business in the State of Georgia; (c) Tenant has the full right, power and authority to enter into this Letter Agreement; and (d) the person signing on behalf of Tenant is authorized to do so without the need of any third-party consents. Upon Landlord's request, Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing representations and warranties.

10. **Broker**. No broker has represented Landlord or Tenant in this transaction. No broker shall be paid a commission by Landlord in connection with this Letter Agreement. Each party agrees to indemnify the other party against all costs, expenses, attorneys' fees or other liability for commissions or other compensation or charges claimed by any broker or agent claiming the same by, through or under such party.

11. **Miscellaneous**. This Letter Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to the State's choice-of-law rules, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. In the event of any inconsistency or conflict between the terms of this Letter Agreement and of the Leases, the terms of this Letter Agreement shall control. Time is of the essence of all of the terms of this Letter Agreement. This Letter Agreement constitutes and contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof. This Letter Agreement may not be changed, modified, discharged or terminated orally in any manner other than by an agreement in writing by Tenant and Landlord or their respective representatives, successors and permitted assigns. This Letter Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute but one and the same instrument. A facsimile or electronic signature hereon shall have the same force and effect as an original.

[*signatures appear on following page*]

11

#232521v19

**IN WITNESS WHEREOF**, the parties have caused this Letter Agreement to be duly authorized, executed, sealed and delivered as of the Effective Date.

**LANDLORD:**

**JAMESTOWN PONCE CITY MARKET, L.P.,**
a Delaware limited partnership

By:     JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:     JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _William Morgan_____
                Name: ___William Morgan_____
                Its: Authorized Person

**JAMESTOWN PCM MASTER TENANT, L.P.,**
a Delaware limited partnership

By:     JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:     JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _William Morgan_____
                Name: _William Morgan_____
                Its: Authorized Person

**ROOFTOP TENANT:**

**SLATER RESTAURANT, LLC,**
a Georgia limited liability company

By: _____
Name: _____
Title: _____

**SLATER PARK, LLC,**
a Georgia limited liability company

By: _____
Name: _____
Title: _____

12

#232521v19

**IN WITNESS WHEREOF**, the parties have caused this Letter Agreement to be duly authorized, executed, sealed and delivered as of the Effective Date.

**LANDLORD:**

**JAMESTOWN PONCE CITY MARKET, L.P.,**
a Delaware limited partnership

By:     JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:     JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _____
                Name: _____
                Its: Authorized Person

**JAMESTOWN PCM MASTER TENANT, L.P.,**
a Delaware limited partnership

By:     JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:     JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _____
                Name: _____
                Its: Authorized Person

**ROOFTOP TENANT:**

**SLATER RESTAURANT, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: Member_____

**SLATER PARK, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: Member_____

12

#232521v19

**TOWER/TERRACE TENANT:**

**SLATER HOSPITALITY, LLC,**
a Georgia limited liability company

By: Kelvin Slater
Name:
Title: Member

**OFFICE LICENSEE:**

**SLATER HOSPITALITY, LLC,**
a Georgia limited liability company

By: Kelvin Slater
Name:
Title: Member

**GUARANTORS ACKNOWLEDGE AND AGREE**

Kelvin Slater and Amanda Slater hereby join in the execution of this Letter Agreement for purposes of evidencing their consent to the terms hereof and to acknowledge and affirm their joint and several guaranty obligations under the Leases, as amended by this Letter Agreement.

Kelvin Slater
Kelvin Slater, individually

Amanda Slater
Amanda Slater, individually

13

#232521v19

#232521v19

**EXHIBIT A**

14

| Rent Schedule - Existing Lease | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | 9/1/2025 | 10/1/2025 | 11/1/2025 | 12/1/2025 | 1/1/2026 | 2/1/2026 | 3/1/2026 | 4/1/2026 | 5/1/2026 | 6/1/2026 | 7/1/2026 | 8/1/2026 | 9/1/2026 | 10/1/2026 | 11/1/2026 | 12/1/2026 |
| RFD Social Base Rent [1] | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | *$32,619.22* | *$32,619.22* |
| Rooftop Terrace Base Rent [2] | $30,746.85 | $30,746.85 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $32,619.33 | $32,619.33 | $32,619.33 | $32,619.33 | $32,619.33 | *$33,597.91* | *$33,597.91* |
| Nine Mile/Skyline Base Rent [3] | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | *$83,994.78* | *$83,994.78* |
| Deferral Rent | | | | | | | $21,024.94 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | | |
| Slaters Management Office [4] | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | *$8,275.86* | *$8,275.86* |
| **Total** | **$148,768** | **$148,768** | **$149,691** | **$149,691** | **$149,691** | **$149,691** | **$170,716** | **$173,091** | **$173,091** | **$174,187** | **$174,187** | **$174,187** | **$174,187** | **$174,187** | **$175,137** | **$175,137** | **$175,137** | **$175,137** | **$154,113** | ***$158,488*** | ***$158,488*** |

*(1) Rent escalates in January each calendar year.*

*(2) Rent escalates in June each calendar year.*

*(3) Rent escalates in November each calendar year.*

*(4) Rent escalates in January each calendar year.*

## EXHIBIT B

Proposed Rooftop Improvement Plans

Tenant's submission of a proposed plan to Landlord for the requested Rooftop improvements shall include the following:

Construction/Engineering:
- Project Scope: A clear description of the project, including goals, materials, and expected results.
- Cost Estimates: A breakdown of the estimated costs, including materials, labor, and permits. Three bids will be required for projects over $50,000.00.
- Timeline: A detailed timeline with key milestones and completion dates.
- Contracts: Draft contracts with any contractors or vendors involved that must include back up for costs and proof of insurance.
- Progress Reports: Dates for regular updates on the status of the project, with photos and descriptions.

Marketing:
- Project Justification: How the project fits in with Tenant's marketing goals.
- Marketing Plan: What marketing activities Tenant is planning around the project, including budget and expected ROI.
- Progress Reports: Dates for updates on marketing efforts and the outcomes.

Property Management:
- Impact Assessment: How the project will affect property operations and customer experience.
- Maintenance Plan: How Tenant plans to maintain the project after it's done.

**Signature:** _Kelvin Slater_
Kelvin Slater (May 1, 2025 14:26 EDT)
**Email:** kfslater@slaterhospitality.com

**Signature:** _Amanda Slater_
Amanda Slater (May 1, 2025 14:31 EDT)
**Email:** mslater@slaterhospitality.com

15

#232521v19

# Jamestown-Slater FINAL Letter Agreement (April 2025)(232521.21)

Final Audit Report                                                2025-05-01

| | |
|---|---|
| Created: | 2025-04-30 |
| By: | ceci christy (ceci30327@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZL9ejk2cEe0zYalDbYqjJyBee7SMBNuf |

## "Jamestown-Slater FINAL Letter Agreement (April 2025)(232521.21)" History

📄 Document created by ceci christy (ceci30327@gmail.com)
2025-04-30 - 10:14:08 PM GMT

✉ Document emailed to Kelvin Slater (kfslater@slaterhospitality.com) for signature
2025-04-30 - 10:14:13 PM GMT

✉ Document emailed to Amanda Slater (mslater@slaterhospitality.com) for signature
2025-04-30 - 10:14:13 PM GMT

📄 Email viewed by Amanda Slater (mslater@slaterhospitality.com)
2025-05-01 - 2:56:46 PM GMT

📄 Email viewed by Kelvin Slater (kfslater@slaterhospitality.com)
2025-05-01 - 6:23:57 PM GMT

✍ Document e-signed by Kelvin Slater (kfslater@slaterhospitality.com)
Signature Date: 2025-05-01 - 6:26:40 PM GMT - Time Source: server

✍ Document e-signed by Amanda Slater (mslater@slaterhospitality.com)
Signature Date: 2025-05-01 - 6:31:43 PM GMT - Time Source: server

✔ Agreement completed.
2025-05-01 - 6:31:43 PM GMT

📜 **Adobe Acrobat Sign**

**EXHIBIT B**

**BUDGET**

**Slater Park LLC**

| | 7/1/25 | 8/1/25 | 9/1/25 | 10/1/25 |
|---|---|---|---|---|
| **Sales** | | | | |
| **Net Sales** | 525,000 | 500,000 | 475,000 | 650,000 |
| **Cost of Sales** | | | | |
| **Total Cost of Sales** | 483,000 | 460,000 | 437,000 | 598,000 |
| **Gross Profit** | 483,000 | 460,000 | 437,000 | 598,000 |
| **Salaries and Wages** | | | | |
| **Total Salaries and Wages** | 184100 | 184100 | 184100 | 184100 |
| **Employee Benefits** | | | | |
| **Total Employee Benefits** | 21400 | 21400 | 24000 | 24000 |
| **Operating Expenses** | | | | |
| **Total Operating Expenses** | 16000 | 15000 | 15000 | 15000 |
| **Utilities** | | | | |
| **Total Utilities** | 3800 | 3800 | 3500 | 3200 |
| **Marketing and Public Relations** | | | | |
| **Total Marketing and Public** | 12000 | 12000 | 12000 | 14000 |
| **Repairs and Maintenance** | | | | |
| **Total Repairs and Maintena** | 3000 | 3000 | 3000 | 3000 |
| **Administrative and General Expenses** | | | | |
| Insurance - general | 43,928 | 43,928 | 43,928 | 43,928 |
| **Total Administrative and Ge** | 59,828 | 60,128 | 59,828 | 59,828 |
| **Occupancy Expenses** | | | | |
| Rent | 37,314 | 37,314 | 37,314 | 37,314 |
| Rent Arrearage | 21,750 | 21,750 | 21,750 | 27,250 |
| Personal Property Taxes | | | | |
| **Total Occupancy Expenses** | 59,064 | 59,064 | 59,064 | 64,564 |
| **Depreciation and Amortization Expenses** | | | | |
| **Total Depreciation and Amo** | - | - | - | - |
| **Interest and Corporate Overhead** | | | | |
| Interest Expense | 2,000 | 2,000 | 2,000 | 2,000 |
| **Total Interest and Corporate** | 2,000 | 2,000 | 2,000 | 2,000 |
| **TOTAL EXPENSES** | **361,192** | **360,492** | **362,492** | **369,692** |

| | | | | |
|---|---|---|---|---|
| **Other Income** | | | | |
| Total Other Income | - | - | - | - |
| | | | | |
| **Income Taxes** | | | | |
| Total Income Taxes | - | - | - | - |
| | | | | |
| **Net Income / (Loss)** | **163,808** | **139,508** | **112,508** | **280,308** |
| | | | | |
| **SBA Payments** | 2,437 | 2,437 | 2,437 | 2,437 |
| Priority Tax Payment | 3,333 | 3,333 | 3,333 | 3,333 |
| **Cash Flow** | 158,038 | 133738 | 106738 | 274538 |

| 11/1/25 | 12/1/25 | 1/1/26 | 2/1/26 | 3/1/26 | 4/1/26 |
|---|---|---|---|---|---|
| 450,000 | 550,000 | 350,000 | 350,000 | 500,000 | 550,000 |
| 414,000 | 506,000 | 322,000 | 322,000 | 460,000 | 506,000 |
| 414,000 | 506,000 | 322,000 | 322,000 | 460,000 | 506,000 |
| 184100 | 184100 | 170000 | 170000 | 170000 | 184100 |
| 24000 | 24000 | 21000 | 21000 | 24000 | 21000 |
| 15000 | 16000 | 12000 | 12000 | 16000 | 16000 |
| 3200 | 4500 | 3200 | 3200 | 3500 | 3800 |
| 12000 | 14000 | 8000 | 8000 | 12000 | 13000 |
| 3000 | 3000 | 1500 | 1500 | 3000 | 3000 |
| 43,928 | 43,928 | 43,928 | 43,928 | 43,928 | - |
| 59,828 | 59,828 | 59,828 | 59,828 | 59,828 | 15,900 |
| 37,314 | 37,314 | 37,314 | 37,314 | 37,314 | 37,314 |
| 27,250 | 27,250 | 27,250 | 27,250 | 27,250 | 27,250 |
| 64,564 | 64,564 | 64,564 | 64,564 | 64,564 | 64,564 |
| - | - | - | - | - | - |
| 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| **367,692** | **371,992** | **342,092** | **342,092** | **354,892** | **323,364** |

| | | | | | |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| **82,308** | **178,008** | **7,908** | **7,908** | **145,108** | **226,636** |
| 2,437 | 2,437 | 2,437 | 2,437 | 2,437 | 2,437 |
| 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| 76538 | 172238 | 2138 | 2138 | 139338 | 220866 |

| 5/1/26 | 6/1/26 | | | | TOTAL |
|---|---|---|---|---|---|
| 700,000 | 525,000 | - | | | **6,125,000** |
| | | | | | - |
| 644,000 | 483,000 | - | 0 | | 5,635,000 |
| 644,000 | 483,000 | - | | | 5,635,000 |
| 184100 | 184100 | - | | | 2,166,900 |
| 21000 | 21000 | - | | | 267,800 |
| 16000 | 16000 | | | | 180,000 |
| 3800 | 3800 | - | | | 43,300 |
| 15000 | 15000 | - | | | 147,000 |
| 3000 | 3000 | | | | 33,000 |
| 145,000 | - | - | | | 540,352 |
| 160,900 | 15,900 | - | | | 731,452 |
| | | | | | - |
| | | | | | - |
| 37,314 | 37,314 | - | | | 447,768 |
| 27,250 | 27,250 | - | | | 310,500 |
| | | | | | - |
| 64,564 | 64,564 | - | | | 758,268 |
| - | - | - | | | - |
| 2,000 | 2,000 | - | | | 24,000 |
| 2,000 | 2,000 | - | | | 24,000 |
| **470,364** | **325,364** | - | 0 | | **4,351,720** |

| | | | | |
|---|---|---|---|---|
| - | - | - | | - |
| - | - | - | | - |
| **229,636** | **199,636** | **-** | | **1,773,280** |
| 2,437 | 2,437 | | | 29,244 |
| 3,333 | 3,333 | | | 39,996 |
| 223866 | 193866 | 0 | 0 | **1,704,040** |

**Slater Tower LLC**

| | 7/1/25 | 8/1/25 | 9/1/25 | 10/1/25 |
|---|---|---|---|---|
| **Sales** | | | | |
| Net Sales | 125,000 | 125,000 | 125,000 | 140,000 |
| **Cost of Sales** | | | | |
| Total Cost of Sales | 115,000 | 115,000 | 115,000 | 128,800 |
| **Gross Profit** | 122,500 | 122,500 | 122,500 | 137,200 |
| **Salaries and Wages** | | | | |
| Total Salaries and Wages | 0 | 0 | 0 | 0 |
| **Employee Benefits** | | | | |
| Total Employee Benefits | 0 | 0 | 0 | 0 |
| **Operating Expenses** | | | | |
| Total Operating Expenses | 5500 | 5500 | 5500 | 5500 |
| **Utilities** | | | | |
| Total Utilities | 2000 | 2000 | 2000 | 2000 |
| **Marketing and Public Relations** | | | | |
| Total Marketing and Public | 0 | 0 | 0 | 0 |
| **Repairs and Maintenance** | | | | |
| Total Repairs and Maintena | 1000 | 1000 | 1000 | 1000 |
| **Administrative and General Expenses** | | | | |
| Total Administrative and Ge | 8000 | 8000 | 8000 | 8000 |
| **Occupancy Expenses** | | | | |
| Rent | 37,314 | 37,314 | 37,314 | 37,314 |
| Rent Arrearage | 21,750 | 21,750 | 21,750 | 27,250 |
| Personal Property Taxes | | | | |
| Total Occupancy Expenses | 59,064 | 59,064 | 59,064 | 64,564 |
| **Depreciation and Amortization Expenses** | | | | |
| Total Depreciation and Amc | - | - | - | - |
| **Interest and Corporate Overhead** | | | | |
| Total Interest and Corporate | - | - | - | - |
| **TOTAL EXPENSES** | 75,564 | 75,564 | 75,564 | 81,064 |

**Other Income**

| | | | | |
|---|---|---|---|---|
| **Total Other Income** | - | - | - | - |
| **Income Taxes** | | | | |
| **Total Income Taxes** | - | - | - | - |
| **Net Income / (Loss)** | **46,936** | **46,936** | **46,936** | **56,136** |
| **SBA Payments** | 731 | 731 | 731 | 731 |
| **Cash Flow** | 46,205 | 46205 | 46205 | 55405 |

| 11/1/25 | 12/1/25 | 1/1/26 | 2/1/26 | 3/1/26 | 4/1/26 |
|---|---|---|---|---|---|
| 120,000 | 175,000 | 95,000 | 95,000 | 110,000 | 110,000 |
| 110,400 | 161,000 | 87,400 | 87,400 | 101,200 | 101,200 |
| 117,600 | 171,500 | 93,100 | 93,100 | 107,800 | 107,800 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 5500 | 4500 | 4500 | 5500 | 5500 | 5500 |
| 2000 | 3000 | 2000 | 2000 | 2000 | 2000 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| 8000 | 8000 | 7000 | 7000 | 7000 | 8000 |
| 37,314 | 37,314 | 37,314 | 37,314 | 37,314 | 37,314 |
| 27,250 | 27,250 | 27,250 | 27,250 | 27,250 | 27,250 |
| 64,564 | 64,564 | 64,564 | 64,564 | 64,564 | 64,564 |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| 81,064 | 81,064 | 79,064 | 80,064 | 80,064 | 81,064 |

| - | - | - | - | - | - |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| **36,536** | **90,436** | **14,036** | **13,036** | **27,736** | **26,736** |
| 731 | 731 | 731 | 731 | 731 | 731 |
| 35805 | 89705 | 13305 | 12305 | 27005 | 26005 |

| 5/1/26 | 6/1/26 | | | TOTAL |
|---|---|---|---|---|
| 125,000 | 125,000 | - | | **1,470,000** |
| | | | | - |
| 115,000 | 115,000 | - | 0 | 1,352,400 |
| 122,500 | 122,500 | - | 0 | 1,440,600 |
| 0 | 0 | - | | - |
| 0 | 0 | - | | - |
| 5500 | 5500 | | | 64,000 |
| 2000 | 2000 | - | | 25,000 |
| 0 | 0 | - | | - |
| 1000 | 1000 | | | 12,000 |
| 8000 | 8000 | - | | 93,000 |
| | | | | - |
| | | | | - |
| 37,314 | 37,314 | - | | 447,768 |
| 27,250 | 27,250 | - | | 310,500 |
| | | | | - |
| 64,564 | 64,564 | - | | 758,268 |
| - | - | - | | - |
| - | - | - | | - |
| **81,064** | **81,064** | - | | **952,268** |

| | | | | |
|---|---|---|---|---|
| - | - | - | | - |
| - | - | - | | - |
| **41,436** | **41,436** | **-** | **-** | **488,332** |
| 731 | 731 | | | 8,772 |
| 40705 | 40705 | | | **479,560** |

**Slater Restaurant LLC**

| | 7/1/25 | 8/1/25 | 9/1/25 | 10/1/25 |
|---|---|---|---|---|
| **Sales** | | | | |
| Net Sales | 500,000 | 500,000 | 500,000 | 600,000 |
| | | | | |
| **Cost of Sales** | | | | |
| Total Cost of Sales | 460,000 | 460,000 | 460,000 | 552,000 |
| | | | | |
| **Gross Profit** | 345,000 | 345,000 | 345,000 | 414,000 |
| | | | | |
| **Salaries and Wages** | | | | |
| Total Salaries and Wages | 178800 | 178800 | 178800 | 178800 |
| | | | | |
| **Employee Benefits** | | | | |
| Total Employee Benefits | 44000 | 42000 | 42000 | 42000 |
| | | | | |
| **Operating Expenses** | | | | |
| Total Operating Expenses | 16000 | 15000 | 15000 | 15000 |
| | | | | |
| **Utilities** | | | | |
| Total Utilities | 3800 | 3800 | 3500 | 3200 |
| | | | | |
| **Marketing and Public Relations** | | | | |
| Total Marketing and Public | 12000 | 12000 | 12000 | 14000 |
| | | | | |
| **Repairs and Maintenance** | | | | |
| Total Repairs and Maintenan | 3000 | 3000 | 3000 | 3000 |
| | | | | |
| **Administrative and General Expenses** | | | | |
| Total Administrative and Ge | 18000 | 18000 | 18000 | 18000 |
| | | | | |
| **Occupancy Expenses** | | | | |
| Rent | 37,314 | 37,314 | 37,314 | 37,314 |
| Rent Arrearage | 21,750 | 21,750 | 21,750 | 27,250 |
| Personal Property Taxes | | | | |
| Total Occupancy Expenses | 59,064 | 59,064 | 59,064 | 64,564 |
| | | | | |
| **Depreciation and Amortization Expenses** | | | | |
| Total Depreciation and Amo | - | - | - | - |
| | | | | |
| **Interest and Corporate Overhead** | | | | |
| Interest Expense | 2,000 | 2,000 | 2,000 | 2,000 |
| Total Interest and Corporate | 2,000 | 2,000 | 2,000 | 2,000 |
| | | | | |
| **TOTAL EXPENSES** | **336,664** | **333,664** | **333,364** | **340,564** |

**Other Income**

| | | | | |
|---|---|---|---|---|
| Total Other Income | - | - | - | - |

**Income Taxes**

| | | | | |
|---|---|---|---|---|
| Total Income Taxes | - | - | - | - |

| | | | | |
|---|---|---|---|---|
| **Net Income / (Loss)** | **8,336** | **11,336** | **11,636** | **73,436** |

| | | | | |
|---|---|---|---|---|
| SBA Payments | 731 | 731 | 731 | 731 |
| Cash Flow | 7,605 | 10605 | 10905 | 72705 |

| 11/1/25 | 12/1/25 | 1/1/26 | 2/1/26 | 3/1/26 | 4/1/26 |
|---|---|---|---|---|---|
| 500,000 | 650,000 | 425,000 | 425,000 | 480,000 | 525,000 |
| 460,000 | 598,000 | 391,000 | 391,000 | 441,600 | 483,000 |
| 345,000 | 448,500 | 293,250 | 293,250 | 331,200 | 362,250 |
| 178800 | 178800 | 165000 | 165000 | 165000 | 178800 |
| 34000 | 34000 | 28000 | 28000 | 28000 | 44000 |
| 15000 | 16000 | 15000 | 15000 | 16000 | 16000 |
| 3200 | 4500 | 3200 | 3200 | 3500 | 3800 |
| 12000 | 14000 | 8000 | 8000 | 12000 | 13000 |
| 3000 | 3000 | 1500 | 1500 | 3000 | 3000 |
| 18000 | 15000 | 15000 | 15000 | 16000 | 16000 |
| 37,314 | 37,314 | 37,314 | 37,314 | 37,314 | 37,314 |
| 27,250 | 27,250 | 27,250 | 27,250 | 27,250 | 27,250 |
| 64,564 | 64,564 | 64,564 | 64,564 | 64,564 | 64,564 |
| - | - | - | - | - | - |
| 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 330,564 | 331,864 | 302,264 | 302,264 | 310,064 | 341,164 |

| - | - | - | - | - | - |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| **14,436** | **116,636** | **(9,014)** | **(9,014)** | **21,136** | **21,086** |
| 731 | 731 | 731 | 731 | 731 | 731 |
| 13705 | 115905 | -9745 | -9745 | 20405 | 20355 |

| 5/1/26 | 6/1/26 | | | TOTAL |
|---|---|---|---|---|
| 550,000 | 500,000 | - | | **6,155,000** |
| | | | | - |
| 506,000 | 460,000 | - | 0 | 5,662,600 |
| 379,500 | 345,000 | - | | 4,246,950 |
| 178800 | 178800 | - | | 2,104,200 |
| 44000 | 44000 | - | | 454,000 |
| 16000 | 16000 | | | 186,000 |
| 3800 | 3800 | - | | 43,300 |
| 15000 | 15000 | - | | 147,000 |
| 3000 | 3000 | | | 33,000 |
| 16000 | 16000 | - | | 199,000 |
| | | | | - |
| | | | | - |
| 37,314 | 37,314 | - | | 447,768 |
| 27,250 | 27,250 | - | | 310,500 |
| | | | | - |
| 64,564 | 64,564 | - | | 758,268 |
| - | - | - | | - |
| 2,000 | 2,000 | - | | 24,000 |
| 2,000 | 2,000 | - | | 24,000 |
| **343,164** | **343,164** | - | | **3,948,768** |

| | | | | |
|---|---|---|---|---|
| - | - | - | | - |
| - | - | - | | - |
| **36,336** | **1,836** | **-** | **-** | **298,182** |
| 731 | 731 | | | 8,772 |
| 35605 | 1105 | | | **289,410** |

**Slater Events LLC**

|  | 7/1/25 | 8/1/25 | 9/1/25 | 10/1/25 |
|---|---|---|---|---|
| **Sales** | | | | |
| **Net Sales** | 175,000 | 135,000 | 125,000 | 155,000 |
| **Cost of Sales** | | | | |
| **Total Cost of Sales** | 161,000 | 124,200 | 115,000 | 142,600 |
| **Gross Profit** | 175,000 | 135,000 | 125,000 | 155,000 |
| **Salaries and Wages** | | | | |
| **Total Salaries and Wages** | 0 | 0 | 0 | 0 |
| **Employee Benefits** | | | | |
| **Total Employee Benefits** | 0 | 0 | 0 | 0 |
| **Operating Expenses** | | | | |
| **Total Operating Expenses** | 3000 | 2500 | 2000 | 3000 |
| **Utilities** | | | | |
| **Total Utilities** | 1200 | 1200 | 1500 | 1500 |
| **Marketing and Public Relations** | | | | |
| **Total Marketing and Public** | 0 | 0 | 0 | 0 |
| **Repairs and Maintenance** | | | | |
| **Total Repairs and Maintena** | 2500 | | 2500 | |
| **Administrative and General Expenses** | | | | |
| **Total Administrative and Ge** | 3000 | 2000 | 2500 | 3000 |
| **Occupancy Expenses** | | | | |
| Rent | 37,314 | 37,314 | 37,314 | 37,314 |
| Rent Arrearage | 21,750 | 21,750 | 21,750 | 27,250 |
| Personal Property Taxes | | | | |
| **Total Occupancy Expenses** | 59,064 | 59,064 | 59,064 | 64,564 |
| **Depreciation and Amortization Expenses** | | | | |
| **Total Depreciation and Amo** | - | - | - | - |
| **Interest and Corporate Overhead** | | | | |
| **Total Interest and Corporate** | - | - | - | - |
| **TOTAL EXPENSES** | 68,764 | 64,764 | 67,564 | 72,064 |

**Other Income**

| | | | | |
|---|---|---|---|---|
| **Total Other Income** | - | - | - | - |
| **Income Taxes** | | | | |
| **Total Income Taxes** | - | - | - | - |
| **Net Income / (Loss)** | **106,236** | **70,236** | **57,436** | **82,936** |
| **SBA Payments** | 731 | 731 | 731 | 731 |
| **Cash Flow** | 105,505 | 69505 | 56705 | 82205 |

| 11/1/25 | 12/1/25 | 1/1/26 | 2/1/26 | 3/1/26 | 4/1/26 |
|---|---|---|---|---|---|
| 120,000 | 145,000 | 110,000 | 110,000 | 115,000 | 115,000 |
| 110,400 | 133,400 | 101,200 | 101,200 | 105,800 | 105,800 |
| 120,000 | 145,000 | 110,000 | 110,000 | 115,000 | 115,000 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 3000 | 2500 | 2500 | 2500 | 3000 |
| 1200 | 2000 | 2000 | 1500 | 1200 | 1200 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 2500 | | 2500 | | 2500 | |
| 2500 | 3000 | 3000 | 2500 | 3000 | 2500 |
| 37,314 | 37,314 | 37,314 | 37,314 | 37,314 | 37,314 |
| 27,250 | 27,250 | 27,250 | 27,250 | 27,250 | 27,250 |
| 64,564 | 64,564 | 64,564 | 64,564 | 64,564 | 64,564 |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| 72,764 | 72,564 | 74,564 | 71,064 | 73,764 | 71,264 |

| - | - | - | - | - | - |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| **47,236** | **72,436** | **35,436** | **38,936** | **41,236** | **43,736** |
| 731 | 731 | 731 | 731 | 731 | 731 |
| 46505 | 71705 | 34705 | 38205 | 40505 | 43005 |

| 5/1/26 | 6/1/26 | | | TOTAL |
|---|---|---|---|---|
| 120,000 | 120,000 | - | | **1,545,000** |
| | | | | - |
| 110,400 | 110,400 | - | 0 | 1,421,400 |
| 120,000 | 120,000 | - | 0 | 1,545,000 |
| 0 | 0 | - | | - |
| 0 | 0 | - | | - |
| 3000 | 3000 | | | 32,000 |
| | | | | - |
| 1500 | 1200 | - | | 17,200 |
| | | | | - |
| | | | | - |
| 0 | 0 | - | | - |
| | | | | - |
| | | | | - |
| 2500 | | | | 15,000 |
| | | | | - |
| | | | | - |
| 3000 | 3000 | | | 33,000 |
| | | | | - |
| | | | | - |
| 37,314 | 37,314 | - | | 447,768 |
| 27,250 | 27,250 | - | | 310,500 |
| | | | | - |
| 64,564 | 64,564 | - | | 758,268 |
| - | - | - | | - |
| - | - | - | | - |
| **74,564** | **71,764** | - | | **855,468** |

| | | | | |
|---|---|---|---|---|
| - | - | - | | - |
| - | - | - | | - |
| **45,436** | **48,236** | **-** | **-** | **689,532** |
| 731 | 731 | | | 8,772 |
| 44705 | 47505 | | | **680,760** |

**Slater Consolidated**

| | 7/1/25 | 8/1/25 | 9/1/25 | 10/1/25 |
|---|---|---|---|---|
| **Sales** | | | | |
| **Net Sales** | 1,325,000 | 1,260,000 | 1,225,000 | 1,545,000 |
| **Cost of Sales** | | | | |
| **Gross Profit** | 1,125,500 | 1,062,500 | 1,029,500 | 1,304,200 |
| **Salaries and Wages** | | | | |
| **Total Salaries and Wages** | 362900 | 362900 | 362900 | 362900 |
| **Employee Benefits** | | | | |
| **Total Employee Benefits** | 65400 | 63400 | 66000 | 66000 |
| **Operating Expenses** | | | | |
| **Total Operating Expenses** | 40500 | 38000 | 37500 | 38500 |
| **Utilities** | | | | |
| **Total Utilities** | 10800 | 10800 | 10500 | 9900 |
| **Marketing and Public Relations** | | | | |
| **Total Marketing and Public** | 24000 | 24000 | 24000 | 28000 |
| **Repairs and Maintenance** | | | | |
| **Total Repairs and Maintena** | 9500 | 7000 | 9500 | 7000 |
| **Administrative and General Expenses** | | | | |
| Insurance - general | 43,928 | 43,928 | 43,928 | 43,928 |
| **Total Administrative and Ge** | 88,828 | 88,128 | 88,328 | 88,828 |
| **Occupancy Expenses** | | | | |
| Rent | 149,256 | 149,256 | 149,256 | 149,256 |
| Rent Arrearage | 87,000 | 87,000 | 87,000 | 109,000 |
| Personal Property Taxes | | | | |
| **Total Occupancy Expenses** | 236,256 | 236,256 | 236,256 | 258,256 |
| **Depreciation and Amortization Expenses** | | | | |
| **Total Depreciation and Amo** | - | - | - | - |
| **Interest and Corporate Overhead** | | | | |
| **Total Interest and Corporate** | 4,000 | 4,000 | 4,000 | 4,000 |
| **TOTAL EXPENSES** | **842,184** | **834,484** | **838,984** | **863,384** |

**Other Income**
  **Total Other Income**

| | | | | |
|---|---|---|---|---|
| | - | - | - | - |
| **Net Income / (Loss)** | 283,316 | 228,016 | 190,516 | 440,816 |
| | | | | |
| **SBA Payments** | 4,630 | 4,630 | 4,630 | 4,630 |
| Priority Tax Payment | 3,333 | 3,333 | 3,333 | 3,333 |
| **Cash Flow** | 275,353 | 220053 | 182553 | 432853 |

| 11/1/25 | 12/1/25 | 1/1/26 | 2/1/26 | 3/1/26 | 4/1/26 |
|---|---|---|---|---|---|
| 1,190,000 | 1,520,000 | 980,000 | 980,000 | 1,205,000 | 1,300,000 |
| 996,600 | 1,271,000 | 818,350 | 818,350 | 1,014,000 | 1,091,050 |
| 362900 | 362900 | 335000 | 335000 | 335000 | 362900 |
| 58000 | 58000 | 49000 | 49000 | 52000 | 65000 |
| 37500 | 39500 | 34000 | 35000 | 40000 | 40500 |
| 9600 | 14000 | 10400 | 9900 | 10200 | 10800 |
| 24000 | 28000 | 16000 | 16000 | 24000 | 26000 |
| 9500 | 7000 | 6500 | 4000 | 9500 | 7000 |
| 43,928 | 43,928 | 43,928 | 43,928 | 43,928 | - |
| 88,328 | 85,828 | 84,828 | 84,328 | 85,828 | 42,400 |
| 149,256 | 149,256 | 149,256 | 149,256 | 149,256 | 149,256 |
| 109,000 | 109,000 | 109,000 | 109,000 | 109,000 | 109,000 |
| 258,256 | 258,256 | 258,256 | 258,256 | 258,256 | 258,256 |
| - | - | - | - | - | - |
| 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 852,084 | 857,484 | 797,984 | 795,484 | 818,784 | 816,856 |

| | | | | | |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| **144,516** | **413,516** | **20,366** | **22,866** | **195,216** | **274,194** |
| 4,630 | 4,630 | 4,630 | 4,630 | 4,630 | 4,630 |
| 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| 136553 | 405553 | 12403 | 14903 | 187253 | 266231 |

| 5/1/26 | 6/1/26 | | TOTAL |
|---|---|---|---|
| 1,495,000 | 1,270,000 | - | **15,295,000** |
| | | | - |
| 1,266,000 | 1,070,500 | - | 12,867,550 |
| 362900 | 362900 | - | 4,271,100 |
| 65000 | 65000 | - | 721,800 |
| 40500 | 40500 | | 462,000 |
| 11100 | 10800 | - | 128,800 |
| 30000 | 30000 | - | 294,000 |
| 9500 | 7000 | | 93,000 |
| 145,000 | - | - | 540,352 |
| 187,900 | 42,900 | - | 1,056,452 |
| | | | - |
| | | | - |
| 149,256 | 149,256 | - | 1,791,072 |
| 109,000 | 109,000 | - | 1,242,000 |
| | | | - |
| 258,256 | 258,256 | - | 3,033,072 |
| - | - | - | - |
| 4,000 | 4,000 | - | 48,000 |
| **969,156** | **821,356** | - | **10,108,224** | - |

| | | | | |
|---|---|---|---|---|
| - | - | - | | - |
| **296,844** | **249,144** | **-** | | **3,249,326** |
| 4,630 | 4,630 | | | 55,560 |
| 3,333 | 3,333 | | | 39,996 |
| 288881 | 241181 | 0 | | **3,153,770** |