UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| In Re:<br><br>SLATER PARK, LLC, *et al*,<br><br>Debtors. | CASE NO. 24-21491<br><br>CHAPTER 11<br>SLATER HOSPITALITY EVENTS, LLC<br>SLATER TOWER, LLC<br>SLATER RESTAURANT, LLC<br>SLATER HOSPITALITY, LLC<br><br>Jointly Administered |

SECOND AMENDED JOINT PLAN OF REORGANIZATION
PROPOSED BY
SLATER PARK, LLC
SLATER TOWER, LLC
SLATER RESTAURANT, LLC
SLATER HOSPITALITY EVENTS, LLC

September 23, 2025

ROUNTREE LEITMAN KLEIN & GEER, LLC

Ceci Christy
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
cchristy@rlkglaw.com
*Counsel for Debtors*
*Slater Park, LLC, Slater Tower, LLC*
*Slater Restaurant, LLC, Slater Hospitality Events, LLC*

NO MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND
RELATED MATERIALS APPROVED BY THE BANKRUPTCY COURT HAVE
BEEN AUTHORIZED FOR USE IN SOLICITING ACCEPTANCES OR
REJECTIONS OF THIS PLAN.

# ARTICLE I.   INTRODUCTION

Slater Park, LLC ("**Park**"), Slater Tower ("**Tower**"), Slater Restaurant ("**Restaurant**"), and Slater Hospitality Events, LLC ("**Events**") (Park, Tower Restaurant, Events are collectively, "**Debtors**"), Debtors and Debtors-in-Possession in the above-captioned bankruptcy case, hereby propose and file the following Second Amended Joint Plan of Reorganization providing for a reorganization of their debts. This Second Amended Joint Plan of Reorganization (the "**Plan**") should be considered in conjunction with the related Amended Joint Disclosure Statement.

# ARTICLE II.   DEFINITIONS AND RULES OF INTERPRETATION

**Section 2.01   *Scope of Definitions and Rules of Interpretation***. For purposes of the Plan, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article II of the Plan. Any term used in the Plan that is not defined herein but is otherwise defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. The rights and obligations arising under the Plan shall be interpreted, governed by, and construed and enforced in accordance with the laws of the State of Georgia (without regard to the conflict of law principles thereof), the Bankruptcy Code, and the Bankruptcy Rules, as appropriate.

**Section 2.02   *Administrative Claim*** shall mean an Allowed Claim for payment of an administrative expense of a kind specified in § 503(b) of the Bankruptcy Code and entitled to priority payment pursuant to § 507(a) of the Bankruptcy Code, including (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving any of the Estate; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses approved, awarded or allowed under §§ 330(a) or 331 of the Bankruptcy Code; (c) the post-Effective Date costs and expenses of administering the Estate; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

**Section 2.03   *Administrative Claims Bar Date*** means the first Business Day that is at least 30 days after the Effective Date.

**Section 2.04   *Allowed Claim*** shall have the meaning set forth in Section 9.01 of this Plan.

**Section 2.05   *Assets*** shall mean all property of Debtors and their Estates as defined in § 541 of the Bankruptcy Code, including without limitation all right, title, and interest in and to any Avoidance Actions or other Causes of Action that Debtors or the Estates may have as of the Effective Date or any time thereafter.

**Section 2.06   *Avoidance Actions*** shall mean any actions, causes of action, claims, demands, suits, or rights, created or arising in favor of Debtors or their Estates under the Bankruptcy Code, including all claims, rights and causes of action arising under § 510 or under any of §§ 542 through 553 of the Bankruptcy Code, in each case regardless of whether such actions, causes of action, claims, demands, suits or rights are commenced prior to or after the Effective Date.

2

**Section 2.07** *Ballot* shall mean each of the voting forms that will be distributed by Order of the Bankruptcy Court to Holders of Claims in Classes that are impaired and entitled to vote under the Plan.

**Section 2.08** *Bankruptcy Cases* shall mean the Chapter 11 bankruptcy cases of Debtors now pending before the Bankruptcy Court.

**Section 2.09** *Bankruptcy Code* shall mean the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended and applicable to this Bankruptcy Case.

**Section 2.10** *Bankruptcy Court* shall mean the United States Bankruptcy Court for the Northern District of Georgia or, in the event such Bankruptcy Court ceases to exercise jurisdiction over the Bankruptcy Case, such court or adjunct thereof that exercises jurisdiction over the Bankruptcy Case in lieu of the United States Bankruptcy Court for the Northern District of Georgia.

**Section 2.11** *Bankruptcy Rules* shall mean: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, (b) the Federal Rules of Civil Procedure, and (c) the Local Rules of the Bankruptcy Court, all as amended from time to time and as applicable to this Bankruptcy Case or proceedings therein.

**Section 2.12** *Bar Date* shall mean the last date set by the Bankruptcy Court to file proofs of claim asserting a pre-petition claim, which date was April 30, 2025 for non-government proofs of claim.

**Section 2.13** *Business Day* shall mean any day, excluding Saturdays, Sundays, and legal holidays, on which commercial banks are open for business in Gainesville, Georgia.

**Section 2.14** *Cash* shall mean legal tender of the United States of America, or a check entitling the holder to immediate payment thereof.

**Section 2.15** *Causes of Action* shall mean any and all of Debtors' and the Estates' claims, causes of action, suits, proceedings, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, torts, penalties, statutory violations, agreements, promises, variances, setoff or recoupment rights, trespasses, damages, or judgments, whether asserted or unasserted, liquidated or unliquidated, based on any act or omission or other event occurring prior to the Effective Date, including Avoidance Actions, and any claims acquired following the Petition Date, including without limitation any such Causes of Action described in the Disclosure Statement.

**Section 2.16** *Claim* shall mean a claim against Debtors or their Estates, as defined in § 101(5) of the Bankruptcy Code.

**Section 2.17** *Claiming Period* shall mean a period of the later of one year following the first Distribution to a Class of Claims or 180 days after a Distribution is made to a claimant on account of which Unclaimed Property first results.

3

**Section 2.18**   *Claims Litigation* shall mean any and all litigation or proceedings arising out of objections to Claims asserted against the Estate, or affirmative counterclaims or requests for setoff or recoupment that are raised with regard to Claims asserted against the Estate.

**Section 2.19**   *Claims Objection Deadline* shall mean the first Business Day that is at least 30 days after the Effective Date.

**Section 2.20**   *Class* shall mean any class into which Claims or Equity Interests are classified under this Plan.

**Section 2.21**   *Confirmation Date* shall mean the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

**Section 2.22**   *Confirmation Hearing* shall mean the hearing on confirmation of the Plan, held pursuant to § 1128 of the Bankruptcy Code.

**Section 2.23**   *Confirmation Order* shall mean the Order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

**Section 2.24**   *Debtors* shall mean Slater Park, LLC, Slater Tower, LLC, Slater Restaurant, LLC, and Slater Hospitality Events, LLC prior to the Effective Date.

**Section 2.25**   *Deficiency Claim* shall mean the Allowed Claim of any secured creditor to the extent that such claim is not a Secured Claim, which shall be treated as a General Unsecured Claim.

**Section 2.26**   *Disallowed Claim* shall have the meaning set forth in Section 9.02 of this Plan.

**Section 2.27**   *Disbursing Agent* shall mean the Reorganized Debtors.

**Section 2.28**   *Disputed Claim* shall have the meaning set forth in Section 9.03 of this Plan.

**Section 2.29**   *Distribution* shall mean a distribution or payment under the Plan to the Holders of Allowed Claims.

**Section 2.30**   *Effective Date* shall mean thirty (60) days from the date that the Confirmation Order has become a Final Order.

**Section 2.31**   *Equity Interests* shall mean the interests of the members of Debtor.

**Section 2.32**   *Estate* shall mean the bankruptcy estate created by the commencement of the Bankruptcy Case, both prior to and following the Confirmation Date.

**Section 2,33**   *Final Order* shall mean an order or judgment, the operation or effect of which has not been stayed, reversed, modified, or amended and as to which order or judgment the time to

4

appeal, petition for certiorari, or seek re-argument, review or rehearing has expired and as to which no notice of appeal, petition for certiorari, or motion for re-argument, review or rehearing was timely filed or, if timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument or rehearing has expired.

**Section 2.32** *General Unsecured Claim* shall mean an Allowed Claim that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Priority Tax Claim, or is not otherwise separately classified.

**Section 2.33** *Holder* means the person or entity with legal standing to assert rights based on a Claim or Equity Interest, as applicable.

**Section 2.34** *Impaired* has the meaning ascribed to it in § 1124 of the Bankruptcy Code.

**Section 2.35** *Initial Distribution Date* shall mean the first business day which is at least thirty (30) business days after the Effective Date.

**Section 2.36** *Insider* shall have the meaning set forth in § 101(31) of the Bankruptcy Code.

**Section 2.37** *Petition Date* shall mean November 22, 2024, the date on which Debtors filed their individual  Chapter 11 petitions commencing this Bankruptcy Cases.

**Section 2.38** *Plan* shall mean this Joint Plan of Reorganization, as it may be modified or amended from time to time pursuant to § 1127 of the Bankruptcy Code.

**Section 2.39** *Priority Claim* shall mean an Allowed Claim entitled to priority pursuant to §§ 507(a)(2) through and including 507(a)(10) of the Bankruptcy Code, but not including Administrative Claims, Professional Claims, or Priority Tax Claims.

**Section 2.40** *Priority Tax Claim* shall mean an Allowed Claim entitled to priority pursuant to § 507(a)(8) of the Bankruptcy Code.

**Section 2.41** *Professional Claim* shall mean any Claim based on professional fees held by any party retained pursuant to §§ 327–330 of the Bankruptcy Code.

**Section 2.42** *Record Date* means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order or any other Final Order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.  The Record Date shall not be later than the Confirmation Date.

**Section 2.43** *Record Holder* means the Holder of a Claim as of the Record Date.

**Section 2.44** *Reorganized Debtor*s shall mean Slater Park, LLC, Slater Tower, LLC, Slater Restaurant, LLC, and Slater Hospitality Events, LLC on and after the Effective Date of the Plan.

**Section 2.45** *Scheduled* shall mean, with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest, as set forth in Debtors' Schedules, as amended.

**Section 2.46** *Schedules* shall mean the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs, filed on or about December 16, 2024 [Park Doc. No. 35] [Tower Doc. No. 29], [Restaurant Doc. No. 33], and [Events Doc. No. 28], and as amended from time to time in this Bankruptcy Case.

**Section 2.47** *Secured Claim* shall mean an Allowed Claim secured by a lien on property of the Estates to the extent of the value, as of the Confirmation Date, of such lien as determined by a Final Order of the Bankruptcy Court pursuant to § 506 of the Bankruptcy Code, or as otherwise agreed in writing by Debtors and the Holder of such Allowed Claim.

**Section 2.48** *Subordinated General Unsecured Claim* means (i) any Claim, or portion thereof, which is subordinated to the payment of all other General Unsecured Claims (other than Claims which are themselves Subordinated General Unsecured Claims) pursuant to § 510 of the Bankruptcy Code, any other applicable law, any order of the Bankruptcy Court or any applicable agreement, or (ii) any Claim for any fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim.

**Section 2.49** *Unclaimed Property* means any funds payable to Holders of Claims which are unclaimed.

**Section 2.50** *Unimpaired* means, with respect to a Class of Claims or Equity Interests, any Class that is not Impaired.

**Section 2.51** *Unsecured Claim* means an Allowed Claim held by a Creditor of any of Debtors, which is not secured by an interest in any of the property of Debtors' Estates.

### ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**Section 3.01** **Introduction**.

(a) All Claims and Equity Interests in the Bankruptcy Case are classified in the Classes below. Notwithstanding any other provision of the Plan, a Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

(b) Under the provisions of § 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in §§ 507(a)(2), 507(a)(3), and 507(a)(8) of the Bankruptcy Code (administrative expenses, "gap" claims, and tax claims) may not be designated by Debtor as being in particular

classes. Notwithstanding this prohibition of classification, these Claims are nevertheless treated in Article IV of this Plan.

**Section 3.02   Classification**. Claims and Equity Interests are classified as follows:

### Class 1.   Allowed Secured Claims of the SBA

Class 1 shall consist of the Allowed Secured Claims of the SBA. Tower, Restaurant, and Events each received a secured disaster loan from the SBA in the principal amount of $150,000. Park received a secured loan from the SBA in the principal amount of $500,000. The SBA asserts a first priority security interest in each of Debtors' tangible and intangible personal property pursuant to the UCC-1s recorded against Debtors as follows:  Park – UCC-1 recorded on May 8, 2020; Tower – UCC-1 recorded on July 10, 2020; Restaurant – UCC-1 recorded on June 26, 2020; and Events – UCC-1 recorded on June 26, 2020. Each of the SBA loans has a 30-year term at 3.75% interest.

### Class 2.   Allowed Arrearage Claim of Jamestown

Class 2 consists of the Jamestown Allowed Arrearage Claim. Jamestown is the Landlord of Park, Restaurant, and Events with Park, Restaurant, Tower, and Events doing business in and on the Ponce City Market Rooftop.  Under the terms of the Letter Agreement between Jamestown and Restaurant, Park, and Events, Jamestown is to be paid $1,562,729.90  for the arrearage due under the Leases which shall be paid over eighteen (18) equal installments in the amount of $86,818.33. The Letter Agreement was approved by the Court and the Leases assumed. [Doc. No. 109]. The Letter Agreement is attached hereto as Exhibit A and is incorporated herein by reference. Should any conflict arise between the Plan and the Letter Agreement, the terms of the Letter Agreement control.

### Class 3.   General Unsecured Creditors

Debtors believe that the only general unsecured creditor claims, if it at all, may be the general unsecured claims of Internal Revenue Service. The Schedules and Statement of Financial Affairs filed on December 16, 2024 for Park [Doc. No. 35], Tower [Doc. No. 29], Restaurant [Doc. No. 33], and Events [Doc No. 28] listed nonpriority unsecured creditors but Debtors have paid these creditors in full during the course of the bankruptcy cases, except for the American Express claim filed in Debtor Park's bankruptcy case. Those unsecured creditors who filed proofs of claim in each case and have been paid in full shall withdraw their proof of claim prior to the confirmation hearing on the Plan or Debtors shall object to the claims.  Any valid and allowed general unsecured claim shall be paid as a Class 3 Claim. Class 3 Claims, if any, shall be paid from Debtors' net revenue in twenty-four equal payments beginning on the last day of the first month following the Effective Date.

### Class 4.   Choate Allowed Unsecured Claim.

Choate filed multiple duplicate claims against Debtors and Slater Hospitality, LLC asserting an unsecured claim in the amount of $703,806.56. Park, Restaurant, Tower, and Events have each objected to Choate's proofs of claim.  Hospitality also has objected to the Choate

Disputed Claim. Choate also filed an unsecured claim in Hull-Ryde's bankruptcy case and Hull-Ryde has objected to this claim. Debtors and Choate resolved Debtors' objections to Choate's proofs of claim filed in each of Debtors' bankruptcy cases and Brett Hull-Ryde's bankruptcy case. As a result of the resolution of each objection, Choate has an Allowed Unsecured Claim in the amount of $100,000.00 as to all Debtors and Brett Hull-Ryde. Debtors shall pay the Choate Allowed Unsecured Claim in four (4) equal installments of $25,000.00 each. The first installment shall be paid on the date the order confirming Debtors' Amended Joint Plan of Reorganization becomes a final order. The second installment shall be paid on the Effective Date of the Amended Joint Plan of Reorganization. The third installment shall be paid on or before April 30, 2026 and the fourth installment shall be paid on or before June 30, 2026. Debtors and Brett Hull-Ryde shall withdraw their objections to Choates' proofs of claim filed in each of the bankruptcy cases.

**Class 5.        Equity Interests.**

On the Effective Date of the Plan, the Slaters will retain their member interests in Debtors and will be the sole owners of Debtors. Hull-Ryde and Slaters hold member interests in Hospitality and will retain their respective interests. The Slaters and Hull-Ryde guaranteed the Slater Westside, LLC SBA loans and the Slaters also guaranteed the Ameris Bank loan. Kelvin Slater guaranteed the Park SBA loan.

**ARTICLE IV. TREATMENT AND IMPAIRMENT
OF CLAIMS AND EQUITY INTERESTS**

The treatment and impairment of each of the classes of Claims and Equity Interests set forth in Article III and the treatment and impairment of Administrative Claims and Priority Claims are described as follows:

**Section 4.01    Administrative Claims**. Unless paid in the ordinary course of business, pursuant to an order of the Bankruptcy Court, or separately classified, and except as may otherwise be agreed between the Debtor and the Holder of an Administrative Claim, the Reorganized Debtor will pay all Administrative Claims that are Allowed Claims as of the Effective Date in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable.  Subsequent to the Effective Date, the Reorganized Debtor will pay each Administrative Claim that becomes an Allowed Claim following the Effective Date in Cash in full as soon as reasonably practicable after the date the Claim becomes an Allowed Claim. Administrative Claims are Unimpaired and are presumed to accept the Plan.

**Section 4.02    Priority Tax Claims**.

(a)  All Priority Tax Claims will be paid in accordance with 11 U.S.C. § 1129.

**Section 4.03    Secured Tax Claims.**

(a)  All Secured Tax Claims will be paid in accordance with the Bankruptcy Code.

**Section 4.04   Priority Claims**.

(b)   Any allowed Priority Claims in this Bankruptcy Case that are not Priority Tax Claims shall be treated as a Class 3 General Unsecured Creditor.

**Section 4.05.  Classes of Claims**

**4.1      Class 1.  Secured Claims of the SBA ("SBA Allowed Secured Claims")**

Class 1 is Unimpaired and is not entitled to vote to accept or reject the Plan.

The SBA Allowed Secured Claims are filed in the Claims Registries of various cases at: (1) Claim No. 6-1 in Case 24-21491-JRS; (2) Claim No. 7-1 in Case 24-21492-JRS; (3) Claim No. 3-2 in Case 24-21493-JRS; and (4) Claim No. 5-1 in Case 24-21494-JRS. As attachments to each of those Claims, the SBA has filed the relevant Promissory Notes, Security Agreements, and related documents (collectively "**the SBA Contractual Documents**"). For avoidance of doubt, the SBA Contractual Documents define the terms and conditions of the loans extended to the Debtors (as collectively defined in Article I). Except as expressly changed in this Plan or the Confirmation Order, as may be amended, the terms and conditions of the SBA Contractual Documents shall remain unchanged and in full force and effect. In the event of any inconsistency, ambiguity, dispute, or conflict between the terms of this Plan or the Confirmation Order, as may be amended, and of the SBA Contractual Documents, the terms and conditions of the SBA Contractual Documents shall control.

Nothing in this Plan shall waive, strip, release, or otherwise modify any security interest granted to the SBA under the SBA Contractual Documents or as a post-petition replacement lien under 11 U.S.C. § 552. Such security interests shall only be released or modified as provided under the SBA Contractual Documents or applicable nonbankruptcy law. Further, nothing in this Plan (including Section 11.04 of the Plan) or the Confirmation Order, as may be amended, shall discharge the SBA's Allowed Secured Claims under 11 U.S.C. § 1141 or other discharge provision of the Bankruptcy Code.

Notwithstanding anything else in this document to the contrary, the SBA Allowed Secured Claims shall be reduced by any payment received by SBA after the Filing Date up to the Effective Date.

**Class 2.  Allowed Arrearage Claim of Jamestown (the "Jamestown Allowed Arrearage Claim**

Class 2 is Impaired and is entitled to vote to accept or reject the Plan.

Jamestown has agreed to vote to accept the Plan.

9

### Class 3.    General Unsecured Creditors (the "GUCs")

Class 3 is Impaired and is entitled to vote to accept or reject the Plan.

Debtor believes that the only GUCs are the asserted priority unsecured claims of the Georgia Department of Labor, Georgia Department of Revenue, the Internal Revenue Service, and the general unsecured claim of American Express.

Nothing herein shall constitute an admission as to the nature, validity, or amount of any claim.  Debtor Tower and Debtor Events each filed an objection to the claim asserted by the Internal Revenue Service filed in the respective case. Debtor Park filed an objection to the claim asserted by the Georgia Department of Revenue in the Park case.

### Class 4.  Allowed Unsecured Claim of Choate (the "Choate Allowed Unsecured Claim")

Class 4 is Impaired and is entitled to vote to accept or reject the Plan.

Choate has an Allowed Unsecured Claim in the amount of $100,000.00 as to all Debtors and Brett Hull-Ryde. Debtors shall pay the Choate Allowed Unsecured Claim in four (4) equal installments of $25,000.00 each. The first installment shall be paid on the date the order confirming the Plan becomes a final order. The second installment shall be paid on the Effective Date of the Plan. The third installment shall be paid on or before April 30, 2026 and the fourth installment shall be paid on or before June 30, 2026.

Debtors and Brett Hull-Ryde shall withdraw their objections to Choates' proofs of claim filed in each of the bankruptcy cases.

Choate has agreed to vote in favor of the Plan.

### Class 5.    Equity Interests

Class 5 is not entitled to vote for the Plan.

## ARTICLE V. MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**Section 5.01   Parties Responsible for Implementation of the Plan**. After the Court's entry of the Confirmation Order, the Reorganized Debtors will be responsible for implementing the Plan. The Reorganized Debtors will be authorized and empowered to take such actions as are required to effectuate the Plan, including the prosecution and enforcement of Causes of Action. The Reorganized Debtors will also file the necessary final reports and will apply for a final decree as soon as practical after substantial consummation and the completion of the claims analysis and objection process.

**Section 5.02   Funding of Plan**. The Distributions contemplated by this Plan shall be made from revenue generated by Reorganized Debtors.

**Section 5.03    Disbursing Agent**. The Reorganized Debtors are authorized to make Distributions pursuant to this Plan and maintain bank accounts in the ordinary course of business or to designate any person or entity to do so on its behalf. The Reorganized Debtors may also pay the ordinary and necessary expenses of administration related to implementation of the Plan in due course.

**Section 5.04    Retained Actions**. On the Effective Date, pursuant to § 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, all Causes of Action (including Avoidance Actions) that Debtors or the Estates had or had power to assert immediately prior to the Confirmation Date, shall become property of the Reorganized Debtors.

**Section 5.05    Settlement of Claims**. The Reorganized Debtors shall be authorized to resolve objections to Claims and enter into settlements and stipulations regarding the amount of Allowed Claims without notice or further order of the Bankruptcy Court.

**Section 5.06    Exclusive Right to Modify Plan**. Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to, or modifications of, the Plan until and including the Confirmation Date.

**Section 5.07    Effectuating Documents; Further Transactions**. Debtors shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**Section 5.08    Further Authorization**. Debtors and the Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary or desirable to carry out the intentions and purposes and to give full effect to the provisions of this Plan.

**Section 5.09    Retention and Payment of Professionals by the Reorganized Debtors**.  Upon the Effective Date, any requirement that professionals comply with §§ 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business for purposes of implementing the Plan or for such other purposes it sees fit in its sole discretion.  Compensation and reimbursement of expenses earned and incurred by professionals performing services for the Reorganized Debtors, as well as Professional Claims arising after confirmation, shall be paid by the Reorganized Debtors monthly after rendition of bills to the Reorganized Debtors, and no further applications for compensation, reimbursements of expenses, or payment of administrative expenses shall be necessary or required unless a dispute arises in regard thereto; in the event of any such dispute, the same shall be resolved by the Bankruptcy Court after notice and hearing.

**Section 5.10    U.S. Trustee Fees and Reporting**. Debtors and the Reorganized Debtors, as appropriate, shall cause to be paid any and all fees of the Office of the United States Trustee as and when such fees become due, until this Bankruptcy Case is closed and a final decree is entered. In addition, the Reorganized Debtors will file all post-confirmation reports required by the United States Trustee's Office. Any outstanding fees owed to the U.S. Trustee as of the Effective Date shall be paid in full on the Effective Date.

## ARTICLE VI.  ACCEPTANCE OR REJECTION OF THE PLAN

**Section 6.01   Classes Entitled to Vote**. Each Impaired Class of Claims shall be entitled to vote to accept or reject the Plan. Each Unimpaired Class of Claims shall be deemed to have accepted the Plan and shall not be entitled to vote to accept or reject the Plan.  Each Disputed Class of Claims is not entitled to vote to accept or reject the Plan.

**Section 6.02   Claim Designations**. The Plan Proponents reserve the right to seek to designate, pursuant to § 1126(e) of the Bankruptcy Code, any vote cast by a Holder of a Claim whose vote on the Plan was submitted for an improper purpose or not in good faith.

## ARTICLE VII. PROVISIONS REGARDING DISTRIBUTIONS

**Section 7.01   Date of Distributions to Creditors**. Payments to Holders of Allowed Claims shall be paid as provided in Article IV of this Plan.

**Section 7.02   Distributions Only on Allowed Claims**. A Claim is in a particular Class and entitled to receive Distributions only to the extent it is an Allowed Claim, and only if and when such Claim becomes an Allowed Claim. A Claim that is ultimately a Disallowed Claim, or otherwise not entitled to any Distribution by settlement, compromise, untimely filing, or other order of the Bankruptcy Court shall not participate in the Distributions to be made under the Plan

**Section 7.03   Distributions to Holders as of the Record Date**. All Distributions on account of Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim. The Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Disbursing Agent shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

**Section 7.04   Delivery of Distributions**. All Distributions to a Holder of an Allowed Claim shall be made by the Disbursing Agent (a) to the address set forth on the proof of claim filed by such Holder, (b) to the address set forth in any written notices of address change delivered to the Debtors' undersigned counsel after the date of filing of any related proof of claim, (c) to the address reflected in the Schedules if no proof of claim has been filed and Debtors have not received a written notice of change of address, or (d) if the Holder's address is not listed in the Schedules and no proof of claim has been filed, at the last known address of such Holder according to the Debtors' books and records.

**Section 7.05   Creditors' Duty to Provide Address Updates**.  It shall be the responsibility of each Holder to maintain a current address with the Disbursing Agent by informing Debtors' undersigned counsel in writing of any address change. Providing such updated address information following any change of address shall be a condition precedent to receiving any Distributions under this Plan.

**Section 7.06   Interest on Claims**. Except as provided in a Final Order entered in the Bankruptcy Case, (a) no Holder of any Claim, other than the Holders of Priority Tax Claims and Allowed Secured Claims, shall be entitled to interest accruing on or after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

**Section 7.07   Method of Payment**. All payments made pursuant to this Plan shall be by check or ACH or wire by the Reorganized Debtors.

**Section 7.08   Prepayment**. Unless the Plan or the Confirmation Order provides otherwise, the Reorganized Debtors shall have the authority to prepay, without penalty, all or any portion of an Allowed Claim at any time.

**Section 7.09   Setoffs**. Debtors may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan on account of such Claim, claims of any nature whatsoever that Debtors, the Estates, or the Reorganized Debtors may have against such Holder of a Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtors, the Estates, or the Reorganized Debtors of any such claim that Debtors may have against such Holder of a Claim.

**Section 7.10   Unclaimed Property**.

(a)   Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within 90 days of their issuance, (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property and (d) checks (and the funds represented thereby) which are not mailed due to the lack of required tax identification information, but only following two mailed requests for this tax identification information.

(b)   During the Claiming Period, Unclaimed Property shall be held solely for the benefit of the Holders of Allowed Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the Holder of an Allowed Claim shall be released and delivered to such Holder upon presentation of proper proof by such Holder of its entitlement thereto.

(c)   In the event that there is Unclaimed Property with regard to any Claim, Debtors shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the Holder of such Claim has expired, retain all subsequent Distributions due with regard to such Claim.

(d)   After the Claiming Period with regard to such Holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied; provided, however, that the Claiming Period may be extended for the Holder of any Allowed Claim by agreement between the Claim Holder and the Debtors. At the end of the Claiming Period, the Holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto and the

13

Unclaimed Property shall become the property of the Reorganized Debtors pursuant to § 347(b) of the Bankruptcy Code.

(e)   All parties entitled to participate in Distributions under this Plan shall be required to notify the Reorganized Debtors in writing of any change in the address to which Distributions are to be sent.

(f)   These provisions shall apply without regard to any applicable non-bankruptcy laws with respect to unclaimed property.

**Section 7.11   Rounding**. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment made by the Reorganized Debtors may reflect a rounding of such fraction down to the nearest whole cent.

**Section 7.12   De Minimis Payments**. The Reorganized Debtors will not issue payments under this Plan on account of any Claim for which the Distribution would equal $20.00 or less.

## ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 8.01   Rejection**. Any executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed rejected on the Effective Date unless the Confirmation Order provides otherwise.

**Section 8.02   Claims for Damages**. Each person who is a party to an executory contract or unexpired lease rejected by Debtors during the pendency of this Bankruptcy Case but prior to confirmation of this Plan must file its claim for damages, including requests for payment of Administrative Claims, by the applicable deadline(s) as previously established or to be established by the Bankruptcy Court, as appropriate.

**Section 8.03   Classification of Claims**. Allowed Claims arising out of the rejection of executory contracts and unexpired leases shall be Class 5 General Unsecured Claims.

## ARTICLE IX.  ALLOWANCE OF CLAIMS

**Section 9.01   Allowed Claims**. An "Allowed" Claim for purposes of the Plan means any one of the following:

(a)   If no objection is filed by Debtors or Reorganized Debtors to a proof of claim on or before the Claims Objection Deadline (as extended, if applicable), such Claim shall be deemed an Allowed Claim, of the type and in the amount set forth in such request or proof of claim; or

(b)   If Debtors or Reorganized Debtors file an objection to such request or proof of claim, then such Claim shall be an Allowed Claim of the type and to the extent provided in (i) a subsequent Final Order of the Bankruptcy Court or (ii) a stipulation agreed upon by the

Debtors, and shall thereafter be treated in accordance with the provisions of such order or stipulation and the Plan.

**Section 9.02     Disallowed Claims**.  A Disallowed Claim is a Claim or any portion thereof that: (i) is not an Allowed Claim or a Disputed Claim, (ii) has been disallowed by a Final Order of the Bankruptcy Court; (iii) is listed in any of Debtors' Schedules at $0.00, unknown, contingent, disputed, or unliquidated and as to which no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court; (iv) is not listed in Debtors' Schedules and as to which a proof of claim bar date has been established but no proof of claim timely filed or deemed timely filed with the Bankruptcy Court; or (v) is not listed in Debtors' Schedules and a proof of claim was timely filed but Debtors have filed a timely objection to the Disputed Claim.

**Section 9.03     Disputed Claims**. A Disputed Claim is a Claim or any portion thereof that is not an Allowed Claim or a Disallowed Claim, and which is the subject of an objection timely filed with the Bankruptcy Court and which objection has not been withdrawn, settled, or overruled by a Final Order of the Bankruptcy Court. Disputed Claims are not entitled to vote to accept or to reject the Plan.

**Section 9.04     Scheduled Claims**. With respect to any claims against Debtors that are listed in Debtors' Schedules, and the Holder of such Claim has not filed a proof of claim, the following shall apply:

(a)  If such claim is not shown in Debtors' Schedules as disputed, unliquidated, or contingent, and if Debtors have not filed an objection to said claim, then such claim shall be deemed an Allowed Claim, of the type and in the amount shown on such Schedules;

(b)  If such claim is shown in Debtors' Schedules as disputed, contingent, and/or unliquidated, then such claim shall be a Disallowed Claim and disallowed in its entirety; or

(c)  If such claim is not shown in Debtors' Schedules as disputed, unliquidated, or contingent, but Debtors have timely filed an objection to such claim, the claim shall be a Disputed Claim until such time that it becomes an Allowed Claim and/or a Disallowed Claim.

**Section 9.05   Claims Objection Deadline**. All objections to Claims must be filed no later than the Claims Objection Deadline, subject to any extension granted by further order of the Bankruptcy Court.

**Section 9.06   Claims Allowed After the Effective Date**. To the extent that any Claim becomes an Allowed Claim after the Effective Date, its Holder will be paid its Distribution in Cash within 30 days after the Claim is allowed or as soon thereafter as is reasonably practicable.

**Section 9.07   Resolution of Claims Objections**. On and after the Effective Date, Debtors shall have the authority to compromise, settle, or withdraw any objections to Claims, or otherwise resolve any Disputed Claims, without further approval of the Bankruptcy Court**.**

**Section 9.08   Adjustment of Claims and Treatment**. Debtors and the Reorganized Debtors shall be authorized, empowered, and permitted subsequent to the Confirmation Date to enter into an agreement or agreements with any creditor providing for payment or treatment of such

15

creditor's Claim upon terms other than those provided in this Plan without further order of the Bankruptcy Court; provided, however, that no such agreement or agreements shall provide for payment or treatment of such creditor's Claim upon terms more favorable to such creditor than the payment or treatment provided for such creditor in this Plan.

**Section 9.09   Administrative Claims Bar Date**. To the extent that any party asserts an Administrative Claim that has not been paid in full by the Effective Date, such party shall file a motion for allowance and payment of such Claim no later than the Administrative Claims Bar Date. Failure of any party to file such a motion prior to the Administrative Claims Bar Date shall entitle the Debtors to presume that no such Claim exists and will result in any such Claim being discharged, unless the Bankruptcy Court orders otherwise after notice and a hearing. The Administrative Claims Bar Date shall not apply to Professional Claims.

**Section 9.10   No Interest on Claims**. Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a post-petition agreement in writing between Debtors and a Holder, post-petition interest shall not accrue or be paid on any Claims, including any Disputed Claim that later becomes an Allowed Claim, and no Holder shall be entitled to any interest accruing on or after the Petition Date with respect to any Claim except as specifically provided in this Plan.

**Section 9.11   No Admissions; Objection to Claims**. Nothing in this Plan shall be deemed to constitute an admission that any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity designated as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of the Debtors to object to or examine any Claim for purposes of voting on the Plan shall not be deemed a waiver of Debtors' rights to object to or reexamine such Claim in whole or in part.

**Section 9.12   No Distributions Pending Allowance**. Except as otherwise provided in the Plan, no Distributions will be made on account of any Claim or portion thereof that is a Disputed Claim unless and until such Claim becomes an Allowed Claim.

**ARTICLE X.   CONDITIONS PRECEDENT**

**Section 10.01  Conditions to Confirmation**. The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with section 10.03 of this Plan:

    (a)   The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to the Debtors in their sole and absolute discretion; and

    (b)   The Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Case.

**Section 10.02  Conditions to the Effective Date**. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with section 10.03 of this Plan:

(a) The Confirmation Order shall not have been vacated, reversed, or modified and, as of the, shall not be stayed; and

(b) All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to Debtors in their reasonable discretion pursuant to the terms of the Plan.

**Section 10.03  Waiver of Conditions to Confirmation or Effectiveness**. The conditions set forth in section 10.01 and section 10.02 of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XI.  EFFECT OF PLAN CONFIRMATION

**Section 11.01  Binding Effect**. On and after the Effective Date, and following confirmation by the Bankruptcy Court, the Plan shall be legally binding upon and inure to the benefit of the Debtors, the Estates, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns, even if they voted to reject the Plan.

**Section 11.02  Vesting of Property in Reorganized Debtors**. Pursuant to 11 U.S.C. § 1141(b), confirmation of this Plan vests all remaining property of the Estate with the Reorganized Debtors as of the Effective Date. Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in Reorganized Debtors as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights and interests of creditors, except as specifically provided in the Plan.

**Section 11.03  Reorganized Debtors' Right to Operate Unsupervised**.  As of the Effective Date, the Reorganized Debtors may manage their operations and use, acquire, and dispose of property and settle and compromise Claims without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**Section 11.04  Discharge**. Pursuant to § 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan to Holders of Allowed Claims shall be in complete satisfaction, discharge, and release of all Claims, whether known or unknown, against the Debtors, the Estates, or the Reorganized Debtors. The Reorganized Debtors will not have any liabilities related to any Claims except those expressly assumed under this Plan.

**Section 11.05  Injunction**. Upon entry of a Confirmation Order in this case, the Confirmation Order shall act as a permanent injunction against any Person commencing or continuing any

17

action, employment of process, or act to collect, offset, or recover any Claim provided for under this Plan against the Debtors or the Reorganized Debtors or against any property of the Debtors or Reorganized Debtors or any property otherwise pledged as collateral against such Claim provided for under this Plan in any jurisdiction whatsoever, except as provided for in this Plan.

**Section 11.06 Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to § 1146 of the Bankruptcy Code, any transfer from the Debtors or the Reorganized Debtors to any other Person or entity pursuant to or in contemplation of this Plan, or any agreement regarding the transfer of title to or ownership of any of the real or personal property held by the Debtors or Reorganized Debtors will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment.

## ARTICLE XII.  GENERAL PROVISIONS

**Section 12.01  Headings**. The headings of the articles, sections and subsections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

**Section 12.02 Notices**. Any notice required or permitted to be provided to the Reorganized Debtors under the Plan shall be in writing and served by overnight courier service or by certified mail, return receipt requested, addressed as follows:

To Reorganized Debtors:
Kelvin Slater
4514 Chamblee Dunwoody Road
Suite 214
Atlanta, GA 30338

with a copy to:
Ceci Christy
Rountree Leitman Klein & Geer, LLC
2987 Clairmont Road
Suite 350
Atlanta, GA 30329

Should either the Reorganized Debtors or their counsel's address change, the applicable party shall notify in writing creditors then receiving payments under the Plan.

**Section 12.03 Amendments and Modifications**. This Plan may be altered, amended, or modified by Debtors at any time, subject, however, to § 1127 of the Bankruptcy Code. This Plan may not be altered, amended, or modified without the written consent of Debtors. Debtors may withdraw this Plan at any time.

**Section 12.04 Revocation of Plan**. Debtors reserve the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to the entry of the Confirmation Order, and upon such revocation and/or withdrawal, this Plan shall be deemed null and void and of no force and effect.

**Section 12.05 Conflicts with Disclosure Statement**. In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

**Section 12.06 Retention of Property of the Estate**. Except to the extent disposed of in accordance with the provisions of this Plan, the Reorganized Debtors shall retain all of the property of the Estate within the meaning of § 541 of the Bankruptcy Code.

**Section 12.07 Severability**. If any section or provision of this Plan is found to be contrary to law or unenforceable, then at the option of the Reorganized Debtors, such section or provision shall be deemed no longer a part of this Plan.

**Section 12.08 Continuation of all Retiree Benefits**. To the extent applicable to the Reorganized Debtors, all retiree benefits, as that term is defined in § 1114 of the Bankruptcy Code, shall be continued in accordance with § 1129(a)(13) of the Bankruptcy Code.

**Section 12.09 Tax Consequences**. Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Equity Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, no specific tax consequences to any Creditor or Holders of an Equity Interest are represented, implied, or warranted. The Plan Proponent assumes no responsibility for the tax effect that consummation of the Plan will have on any given Holder of a Claim or Equity Interest. Holders of Claims or Equity Interests are strongly urged to consult their own tax advisors covering the federal, state, local, and/or foreign tax consequences of the Plan to their individual situation.

**Section 12.10 Applicable Law**. Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Georgia.

**Section 12.11 Retention of Jurisdiction by the Bankruptcy Court**. Until this Bankruptcy Case is closed and a final decree issued, the Bankruptcy Court shall retain jurisdiction over all matters arising out of or relating to this Bankruptcy Case, including, but not limited to, the following matters:

(a) To determine the allowance or classification of Claims or Equity Interests under this Plan and to determine any objections thereto;

(b) To construe and to take any action to enforce this Plan and to issue such orders as may be necessary for the implementation, execution, and consummation of this Plan;

19

(c) To determine all applications for allowance of compensation or reimbursement of expenses;

(d) To determine any other request for payment of Administrative Claims;

(e) To resolve any dispute regarding the implementation or interpretation of this Plan;

(f) To determine any and all motions pending as of the Confirmation Date for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(g) To determine all applications, motions, adversary proceedings, contested matters and other litigated matters that may be pending in the Bankruptcy Court on or initiated after the Effective Date;

(h) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(i) To modify the Plan pursuant to § 1127 of the Bankruptcy Code, or to remedy any apparent nonmaterial defect or omission in this Plan, or to reconcile any nonmaterial inconsistency in this Plan so as to carry out its intent and purpose;

(j) To enter an order or final decree closing this Bankruptcy Case;

(k) To determine matters under § 505 of the Bankruptcy Code relating to any tax for which the Reorganized Debtors may be liable;

(l) To consider and act on the compromise and settlement of any claim against the Debtors or Debtors-in-Possession or their Estates;

(m) To determine all questions and disputes regarding title to the assets of the Debtors, Debtors-in-Possession, the Estates, or the Reorganized Debtors; and

(n) To construe, enforce and resolve all questions and disputes relating to employment agreements existing or approved by the Bankruptcy Court at or prior to Confirmation.

**Section 12.12 Final Decree**. The Bankruptcy Court may, upon application of the Reorganized Debtors, at any time after "substantial consummation" of the Plan as defined in § 1101(2) of the Bankruptcy Code, enter a final decree in the Bankruptcy Case, notwithstanding the fact that additional funds may eventually be distributed to parties-in-interest. In such event, the Bankruptcy Court may enter an order closing this Bankruptcy Case pursuant to § 350 of the Bankruptcy Code; provided, however, that (a) the Reorganized Debtors shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may, from time to time, reopen the Bankruptcy Cases if appropriate for any of the following purposes: (i) administering Assets; (ii) entertaining any adversary proceedings, contested matters; or applications Debtors have brought or will bring with regard to the liquidation

of Assets and the prosecution of Causes of Action; (iii) enforcing or interpreting this Plan or supervising its implementation; or (iv) for other cause. The Reorganized Debtors shall be authorized to reopen the Bankruptcy Cases for purposes of obtaining a discharge after entry of the final decree and the fee associated with the attendant motion to reopen the Bankruptcy Case shall be waived, and the Reorganized Debtors shall not be responsible for payment of such to the clerk of the Bankruptcy Court.

Dated: September 23, 2025                    **ROUNTREE LEITMAN KLEIN & GEER, LLC**

                                             */s/ Ceci Christy*_____
                                             Ceci Christy, Ga. Bar No. 370092
                                             Century Plaza I
                                             2987 Clairmont Road, Suite 350
                                             Atlanta, Georgia 30329
                                             (404) 584-1238 Telephone
                                             cchristy@rlkglaw.com
                                             *Attorneys for Slater Park, LLC,*
                                             *Slater Tower, LLC, Slater Restaurant, LLC,*
                                             *Slater Hospitality Events, LLC*

EXHIBIT A

## LETTER AGREEMENT

**THIS LETTER AGREEMENT** (this "**Letter Agreement**") is made and entered into this 1st day of May 2025 (the "**Effective Date**"), by and among **JAMESTOWN PONCE CITY MARKET, L.P.**, a Delaware limited partnership, whose address is 675 Ponce de Leon Avenue NE, 7th Floor, Atlanta, Georgia 30308, being duly authorized for the purposes hereof ("**Landlord**") and **SLATER RESTAURANT, LLC**, a Georgia limited liability company, and **SLATER PARK, LLC**, a Georgia limited liability company, jointly and severally (collectively, "**Rooftop Tenant**"), and **SLATER HOSPITALITY EVENTS, LLC**, a Georgia limited liability company ("**Tower/Terrace Tenant**" or "**Office Licensee**").

**WHEREAS**, Landlord and Rooftop Tenant are parties to that certain Rooftop Site Lease Agreement, dated March 31, 2016, as amended by that certain First Amendment to Rooftop Site Lease Agreement dated August 8, 2016, that certain Second Amendment to Rooftop Site Lease Agreement dated May 19, 2017, that certain Third Amendment to Rooftop Site Lease Agreement dated May 22, 2018, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Rooftop Lease**"), relating to certain rooftop space (as more particularly described in the Rooftop Lease) located at Ponce City Market located at 675 Ponce de Leon Avenue NE, Atlanta, Georgia 30308 (the "**Project**");

**WHEREAS**, Landlord and Tower/Terrace Tenant are parties to that certain Ponce City Market Tower Lease Agreement dated May 19, 2017, as amended by that certain Amendment No. 1 to Ponce City Market Tower Lease Agreement, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Tower Lease**"), relating to certain tower space (as more particularly described in the Tower Lease) at the Project;

**WHEREAS**, Landlord and Tower/Terrace Tenant are parties to that certain Ponce City Market Rooftop Site Lease Agreement dated May 19, 2017, as amended by that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Terrace Lease**"), relating to certain rooftop terrace space (as more particularly described in the Terrace Lease) at the Project;

**WHEREAS**, Jamestown PCM Master Tenant, L.P., as "Licensor", and Office Licensee are parties to that certain License Agreement dated May 31, 2018, as amended by that certain Amendment No. 1 to Ponce City Market Tower Lease Agreement, that certain Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated October 30, 2020, that certain Amended and Restated

1

Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, and that certain Letter Agreement dated November 24, 2023 (collectively, the "**Office License**"), relating to certain office space (as more particularly described in the Office License) at the Project;

WHEREAS, the Rooftop Lease, the Tower Lease, and the Terrace Lease are collectively referred to as the "**Rooftop Leases**";

WHEREAS, the Rooftop Lease, the Tower Lease, the Terrace Lease and the Office License are, unless context dictates otherwise, collectively referred to as the "**Leases**";

WHEREAS, Rooftop Tenant, Tower/Terrace Tenant and Office Licensee are, unless context dictates otherwise, individually and collectively referred to as "**Tenant**";

WHEREAS, Landlord and Jamestown PCM Master Tenant, L.P. are, unless context dictates otherwise, individually and collectively referred to as "**Landlord**";

WHEREAS, the spaces leased by Tenant under the Rooftop Leases and the space licensed by Office Licensee under the Office License are, unless context dictates otherwise, collectively referred to as the "**Premises**";

WHEREAS, pursuant to the Amended and Restated Letter Agreement Regarding Rooftop, Tower and Terrace Leases and Office License Agreement dated February 9, 2021, Landlord and Tenant agreed, among other things, to defer payment of $253,297.08 in Rent owed under the Rooftop Lease, the Tower Lease and the Terrace Lease for the months of January and February 2021 (the "**Deferred Rent**"), with the Deferred Rent to be paid to Landlord in monthly installments of $21,024.94, due and payable on the first (1st) day of each calendar month commencing on October 1, 2025 and continuing until the last payment is made on September 1, 2026, as also set forth in Exhibit A of this Letter Agreement;

WHEREAS, Tenant is in default of each Lease;

WHEREAS, on November 22, 2024, Tenants filed for chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Northern District of Georgia (Gainesville Division) and such cases remain pending and are jointly administered in Case. No. 24-21491-JRS (the "**Bankruptcy Proceeding**");

WHEREAS, Tenant owes Landlord $2,062,729.90 in pre-petition rent and other financial obligations past-due and owing under the Leases (the "**Rental Arrearage**"), not inclusive of late fees, interest or legal fees and costs; and

WHEREAS, Landlord and Tenant desire to make and enter into this Letter Agreement for the purpose of evidencing their mutual understanding and agreement regarding: (a) modification of Lease terms as explicitly set forth herein; (b) the extension of the terms of the Leases; (c) the amendment to consolidate and confirm Tenant's payment of Minimum Rent, Base Rent, Operations Rent, and Deferred Rent

2

#232521v19

(collectively, for purposes of this Letter Agreement, "**Rent**") under the Leases with strict compliance required; (d) the repayment of Tenant's Rental Arrearages; (e) the establishment of performance obligations for Tenant with respect to Tenant's businesses operated at the Premises; (f) amended and supplemented Landlord's default and recapture rights; and (g) certain other matters relating thereto as set forth below.

**NOW THEREFORE**, for and in consideration of the Premises, the keeping and performance of the covenants and agreements hereinafter contained, and for Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree to amend and supplement the Leases as follows:

1.      **Recitals; Defined Terms**.  The foregoing recitals are incorporated herein and are made a material part of this Letter Agreement.  Unless otherwise defined herein, all capitalized terms shall have the respective meanings ascribed thereto in the Leases, as applicable.

2.      **Leases in Effect; Conflicts**. This Letter Agreement shall be incorporated into and made part of the Leases. Except as provided herein, all other terms and conditions of the Leases shall remain unchanged and in full force and effect and are hereby ratified and confirmed by Landlord and Tenant. In the event of any inconsistency or conflict between the terms of this Letter Agreement and of the Leases, the terms of this Letter Agreement shall control.

3.      **Extension of Term**. Landlord and Tenant hereby extend the Term of each of the Leases for an additional sixty (60) months, commencing on November 1, 2026, and expiring on October 31, 2031 (said sixty (60) month extension is referred to herein as the "**Extended Term**"), unless sooner terminated in accordance with the terms of the Leases, as amended hereby.

4.      **Amended and Restated Rent Obligations under the Leases**. Landlord and Tenant agree that Tenant's Rent obligations under the Leases shall be amended as set forth in this Section.

(a)      **Collective Minimum Rent**. Tenant shall pay Minimum Rent under the Leases for use of the Premises as set forth in this Section 4(a). The sum of the Minimum Rent for the Leases shall be due and payable in monthly installments, in advance, on the first (1st) day of each calendar month. For the avoidance of doubt, "**Minimum Rent**" as used herein shall amend and restate Tenant's "Minimum Rent" payment obligations under the Rooftop Leases, and Tenant's "Base Rent" payment obligations under the Office License.

(i)      For each month during the Term and November and December of the Extended Term, the monthly installments of the Minimum Rent for the Leases are as set forth in Exhibit A of this Letter Agreement.

3

#232521v19

(ii) For each month during the period beginning on January 1, 2027 and continuing through the expiration of the Extended Term, the monthly installments of the Minimum Rent for the Office License are as set forth below.

| Year | Monthly Minimum Rent – Office License |
|---|---|
| 2027 | $8,524.14 |
| 2028 | $8,779.86 |
| 2029 | $9,043.26 |
| 2030 | $9,314.56 |
| 2031 (Jan 1, 2031 – Oct 31, 2031) | $9,593.99 |

(iii) For each month during the period beginning on January 1, 2027 and continuing through the expiration of the Extended Term, the monthly installments of the Minimum Rent for the Rooftop Leases are as set forth below.

| Year of Extended Term | Monthly Minimum Rent – Rooftop Leases |
|---|---|
| 2027 | $169,682.25 |
| 2028 | $175,606.08 |
| 2029 | $180,874.25 |
| 2030 | $186,300.50 |
| 2031 (Jan 1, 2031 – Oct 31, 2031) | $191,889.50 |

(b) **Overage Rent**. Beginning on the Effective Date and continuing through the expiration of the Extended Term, in addition to the monthly Minimum Rent for the Rooftop Leases payable to Landlord pursuant to Section 4(a) above, for any calendar month (pro-rated for any partial calendar month) in which the amount that is ten percent (10%) of Tenant's Gross Revenues (as defined below), exceeds the amount which Tenant previously paid to Landlord as Minimum Rent for such month (in each instance, the "**Overage**"), Tenant shall pay to Landlord "**Overage Rent**" in accordance with this Section 4(b). Each monthly Overage Rent payment shall be due and payable within ten (10) calendar days following the last day of such calendar month. For the avoidance of doubt, "**Overage Rent**" as used herein shall amend and restate Tenant's "Operations Rent" payment obligations under the Rooftop Leases.

(i) **Calculation of Overage Rent**. For any calendar month in which there is an Overage, the Overage Rent payment shall be equal to ten percent (10%) of the Gross Revenues for such month minus the Minimum Rent for such month.

(ii) **Payment of Overage Rent; Reporting Gross Revenues**. Within ten (10) days following the last day of each calendar month, Tenant shall submit to Landlord a statement itemizing and showing in reasonable detail Tenant's Gross Revenues (a "**Statement**"). If in a calendar month, there is an Overage, Overage Rent for such calendar month shall be due and payable by Tenant to Landlord within ten (10) calendar days following the last day of such calendar month, and the applicable Statement shall be accompanied by Tenant's payment of Overage Rent for that calendar month. For example, if the monthly Gross Revenues in January 2027 equal $1,800,000.00, then for January 2027 there would be an

4

#232521v19

Overage, and the Overage Rent would be $10,317.75, and Tenant would be required to remit payment of January 2027's Overage Rent no later than February 10, 2027.

(iii)    **Inspection of Tenant's Books and Records**. Landlord shall have the right, upon not less than five (5) days' prior written notice, during Tenant's customary business hours and at Tenant's principal office location to audit the books and records of Tenant pertaining to Gross Revenues, Overage, Overage Rent and Statements. On request of Landlord, Tenant shall make all information pertaining to all Operations available for examination at the Premises. If Landlord shall have such an audit made, and Tenant's Gross Revenues shall be found to be understated by more than four percent (4%), then Tenant shall be in default under this Letter Agreement and Landlord may elect to enforce any of its available remedies, including termination of the Leases and recapture of the Premises. In any event, Tenant shall promptly pay to Landlord any deficiency in Overage Rent plus interest at the Default Rate from the date such payment should have been made to the date of payment. Such examination and audit may be made by Landlord or an accountant as designated in writing by Landlord.

(iv)    **Gross Revenues Defined**. "**Gross Revenues**" shall mean the sum of any and all sales and revenues from the Premises including, without limitation, entrance fees, food and beverage sales, amusement fees, special events fees, ticket sales, corporate buy-outs, catering fees, bar fees, rental fees and sponsorship, advertising and promotions revenues, and in-kind donations made by Tenant.

(c)    **Other Monthly Payment Obligations**. Tenant acknowledges and agrees that the amended Minimum Rent obligations provided herein are in addition to Tenant's other payment obligations under the Leases and this Letter Agreement, including but not limited to the charges associated with real estate and other taxes payable by Landlord (other than net income taxes) that are directly attributed to the Premises, all operating costs in connection with Tenant's use and occupancy of the Premises, the HVAC Water Charge (as defined in the Office License), Deferred Rent (as set forth Exhibit A), and any other monthly financial obligations in the Leases. These payments shall be due and payable to Landlord on the first (1st) day of each calendar month. For the avoidance of doubt, this Letter Agreement does not limit or reduce Tenant's financial obligations under the Leases except as explicitly set forth in Section 5(b) of this Letter Agreement.

5.    **Repayment of Rental Arrearages**. Landlord and Tenant agree to the below repayment terms of the Rental Arrearage (collectively, the "**Repayment Obligation**"):

(a)    Tenant shall repay $1,562,729.90 of the Rental Arrearage in eighteen (18) equal monthly installments, each in the amount of $86,818.33, which shall be due and payable on the fifteenth (15th) day of each calendar month, beginning on May 15, 2025 through October 15, 2026 (the "**Repayment**

5

#232521v19

**Schedule**"). The monthly Repayment Schedule installments shall be paid to Landlord in the same manner as Tenant pays monthly Minimum Rent, strict compliance required with time of the essence.

(b)      Landlord and Tenant agree to the repayment or forgiveness, as applicable, of the remaining $500,000.00 of the Rental Arrearages in accordance with the terms of this Section 5(b):

(i)      Tenant shall provide to Landlord no later than September 1, 2025 a detailed plan of proposed improvements to the Premises for Landlord's approval. The plan shall include a description of the proposed improvements, depictions of the anticipated appearance of the Premises upon completion of the proposed improvements, estimated costs, a construction timeline, and contractor details as specified on Exhibit B to this Letter Agreement. Upon submission of a complete plan, Landlord shall have thirty (30) days to review the plan and either approve it or provide written comments and requested modifications. Tenant shall revise and resubmit the plan incorporating Landlord's feedback within fifteen (15) days of receiving such comments. The plan shall be deemed approved upon the earlier of: (x) Landlord's written confirmation of acceptance or (y) thirty-five (35) days after the initial submission if Landlord provides no written response to Tenant.

(ii)      Tenant shall install all approved improvements at the Premises, to Landlord's satisfaction, by March 31, 2026.

(iii)      Tenant shall receive a credit toward its Repayment Obligation for all approved and actually incurred improvement costs at the Premises, up to a maximum of $500,000.00, provided that such costs are expended on or before March 31, 2026, and Tenant submits to Landlord (a) valid permits, (b) lien waivers, (c) paid receipts, and (d) an affidavit of completion from the contractor or subcontractor for all such work. Any qualifying improvements meeting the requirements of this Section 5(b) shall be applied as a credit toward the Repayment Obligation, and the Landlord shall forgive an equivalent portion of the Rental Arrearage in the amount of such credit.

(iv)      For any remaining portion of the Rental Arrearage not forgiven pursuant to Section 5(b)(iii), Tenant shall pay to Landlord such portion no later than November 1, 2026, payable in the same manner as Tenant pays rent.

(v)      Notwithstanding anything to the contrary contained herein, any permitting delay, strike, lockout and/or labor dispute, such strike, lockout and/or labor dispute shall not excuse or delay the performance by Tenant as provided in this Section 5 and this Letter Agreement.

#232521v19

6.      **Performance Obligations**. In addition to the payment of Rent and the performance of the Repayment Obligation, Tenant shall also comply with the following obligations concerning Tenant's operation of its businesses at the Premises (collectively, the "**Performance Obligations**"):

(a)      **Business Plan**. Tenant shall provide to Landlord no later than June 30, 2025 a detailed business plan that outlines how Tenant will bring Gross Revenues at the Premises to at least $20,000,000 annually by the calendar year 2027. The business plan shall include, at a minimum: (i) a market analysis, (ii) capital improvements; (iii) revenue projections broken down by quarter with supporting assumptions, (iv) a marketing and sales strategy, including customer acquisition and retention plans, (v) an operational strategy, including staffing, supply chain management, and capital investments, and (vi) a timeline with measurable performance benchmarks. If requested by Landlord, upon reasonable notice to Tenant, Tenant shall present the business plan to Landlord in a formal meeting, either in person or via video conference, within [ten (10)] days of submission. Landlord shall review the business plan in good faith and provide written feedback, including any required revisions, within [fifteen (15)] business days of the presentation. Tenant agrees to reasonably cooperate and diligently revise the business plan as directed by the Landlord to address such feedback. The business plan shall be finalized and approved by the Landlord no later than August 15, 2025. In the event Landlord does not provide any written feedback on the timeline provided by this Section 6(a), Tenant's obligations under this Section 6(a) are deemed satisfied.

(b)      **Monthly Meetings**. Tenant shall meet with Landlord monthly, upon Landlord's request and with reasonable notice to Tenant, to review Tenant's efforts with respect to increasing its Gross Revenues.

(c)      **Minimum Gross Revenues Requirement**. In addition to Tenant's obligations under the Leases, Tenant must maintain minimum Gross Revenues during the Term, including the Extended Term, on 12-month basis in an amount equal to or greater than the applicable sum of the following quarterly benchmark amounts ("**Minimum Gross Revenues**"):

| Year | Q1 | Q2 | Q3 | Q4 |
|------|------|------|------|------|
| 2025 | $2,535,000 | $4,501,500 | $3,981,000 | $3,979,500 |
| 2026 | $2,661,750 | $4,726,575 | $4,180,050 | $4,178,475 |
| 2027 | $2,794,753 | $4,962,753 | $4,388,920 | $4,387,266 |
| 2028 | $2,934,685 | $5,211,236 | $4,608,671 | $4,606,935 |
| 2029 | $3,081,208 | $5,471,423 | $4,838,773 | $4,836,950 |
| 2030 | $3,235,336 | $5,745,114 | $5,080,818 | $5,078,903 |
| 2031 | $3,397,069 | $5,032,310 | $5,334,805 | $5,332,795 |

(d)      **Landlord's Recapture Remedy for Tenant's Failure to Meet Minimum Gross Revenues**. Landlord may terminate Tenant's possessory interest in the Premises and any right asserted by Tenant to operate at the Premises upon written notice effective ninety (90) calendar days from the date of such notice with no opportunity to cure if Tenant fails to meet the Minimum Gross Revenues for any twelve (12) month period (in each instance, a "**Minimum Gross Revenues Default**"). Beginning on January 1, 2027 and through the remainder of the Term, including the Extended Term, Landlord may issue a Minimum Gross Revenues Default for any failure by Tenant to achieve Minimum Gross Revenues for any trailing

7

#232521v19

twelve (12) month period. The earliest twelve (12) month trailing measurement period for a Minimum Gross Revenue Default will be the 2026 calendar year. For the avoidance of doubt, the applicable twelve (12) month trailing period for a Minimum Gross Revenues Default may span calendar years.

7.    **Termination of Tenant's Right of Possession and Tenant's Obligation to Vacate the Premises**.

(a)    **Collective Effect Clause**. Tenant acknowledges and agrees that a material condition to the Landlord's willingness to execute this Letter Agreement is that Tenant agrees that Landlord's remedies for a Default, whether or not attributable to a particular Lease, will apply to all of the Leases and remedies will apply to all Premises. Tenant further expressly acknowledges and agrees that it hereby waives any claim or defense of any kind related to partial performance under the Leases or this Letter Agreement.

(b)    **Events of Default**. The following shall each be deemed to be a "**Default**" under this Letter Agreement and the Leases, time being of the essence, without any notice or cure period unless otherwise expressly stated:

(i)    Any part of the Rent required to be paid by Tenant under the Leases is not paid when due;

(ii)    Any part of the Repayment Obligation required to be paid by Tenant under this Letter Agreement is not paid when due;

(iii)    Any monthly Gross Revenues report required under this Letter Agreement is not submitted by Tenant when due;

(iv)    Any part of the Overage Rent required to be paid by Tenant under the Leases is not paid when due;

(v)    Tenant underreports its Gross Revenues on a Statement by more than four percent (4%);

(vi)    Tenant fails in the observance or performance of any of its Performance Obligations under this Letter Agreement, provided that any failure to meet the Minimum Gross Revenues requirement shall be subject to the terms of Section 6(d) of this Letter Agreement;

(vii)    Tenant fails to operate the Premises at any time without prior written approval of the Landlord, except for previously approved closures of Skyline Park and RFD Social on Mondays through Thursdays in January and February of each year and closures arising from weather conditions that prevent safe operations, as reasonably determined by Tenant;

8

#232521v19

(viii)    The Bankruptcy Proceeding is voluntarily or involuntarily dismissed and Landlord does not approve of the dismissal;

(ix)    If Tenant is cited for failure to comply with any federal, state, county, or municipal health and safety regulation that Tenant fails to cure within the time set forth in any such citation.

(x)    If Tenant or any of its principals (or Guarantors) commits, is convicted of, or pleads guilty or "nolo contendere" to a felony (or misdemeanor punishable by imprisonment for more than one year), a crime involving moral turpitude, or any other act, crime, or offense that Landlord reasonably believes is injurious to the Project;

(xi)    A lien is placed on the Premises resulting from any action or failure to act by the Tenant, the Tenant shall, within ten (10) days after notice from the Landlord, take all necessary steps to discharge such lien or encumbrance. If the Tenant fails to do so within the ten (10) day period, in addition to Landlord's default remedies, the Landlord shall have the right, but not the obligation, to pay the amount required to discharge the lien or encumbrance, and the Tenant shall immediately reimburse the Landlord for any such amounts paid; and

(xii)    Tenant fails in the observance or performance of any of its other covenants, agreements or conditions provided for in the Letter Agreement.

(c)    **Termination of Tenant's Rights of Possession and Tenant's Obligation to Vacate the Premises**. In addition to Landlord's default and termination rights under the Leases, should any Default occur, then the Leases and Tenant's rights of possession of the Premises granted thereunder will automatically terminate <u>without notice</u> upon the earlier of (i) the day the Default (other than a Minimum Gross Revenues Default and lien default) occurs, if there is no Cure Period (as defined in Section 7(d)), (ii) ten (10) calendar days after notice from the Landlord of a lien default; (iii) ninety (90) calendar days after Landlord sends to Tenant written notice of a Minimum Gross Revenues Default, or (iv) the day immediately following the expiration of the Cure Period without a cure of the Default, if there is a Cure Period. Contemporaneously with the termination of Tenant's right to possession of the Premises under the Leases, time being of the essence, Tenant must cease operations, vacate the Premises and deliver possession of the Premises to Landlord in the condition required by the Leases. Tenant acknowledges and agrees that returning the Premises to Landlord in the condition required under the Leases is a material consideration for this Letter Agreement. Tenant further acknowledges and agrees that all leasehold improvements to the Premises (including, without limitation, furniture, fixtures, equipment, Amusements, Games, and signs) shall become the property of Landlord upon expiration or earlier termination of the Lease, and Tenant shall not remove any such leasehold improvements from the Premises.

(d)    **Notice and Limited Opportunity to Cure Payment Defaults**. Upon the occurrence of a Default for Tenant's failure to pay Rent, Overage Rent, or a portion of the Repayment

9

#232521v19

Obligation when due (each, a "**Payment Default**"), Tenant shall have five (5) calendar days from the date Landlord sends written notice of the Payment Default to Tenant to cure such Payment Default (the "**Cure Period**"), provided however, that such opportunity to cure shall only be available to Tenant in the event that Tenant timely sent the applicable payment (and provides proof of same) and the Payment Default only occurred as a result of a delay caused by the bank(s) involved in the remittance of the payment, and provided further that there will only be one (1) Cure Period available to Tenant within any consecutive twelve (12) month period.

(e)     **Security for Repayment**. As a material inducement for Landlord to enter into this Letter Agreement, contemporaneously with executing this Letter Agreement, Landlord and Tenant will execute Consent Orders which provide for Landlord to recapture the Premises in the event of the termination of Tenant's rights of possession of the Premises pursuant to Section 7(c) of this Letter Agreement.

(f)     **Release by Tenant**. Except as hereinabove provided, all other terms and conditions of the Leases shall remain unchanged and in full force and effect and are hereby ratified and confirmed by Landlord and Tenant. Tenant, on behalf of itself and its successors, assigns, affiliates, owners, employees, agents, attorneys, and representatives, hereby acknowledges and agrees that, as of the Effective Date of this Letter Agreement, (i) the Leases are subject to no offsets, claims, counterclaims or defenses of any nature whatsoever; (ii) there are no defaults or breaches on the part of Landlord under the Leases, regardless of the giving of notice or the passage of time, or both, and (iii) all of Landlord's obligations accrued to date have been performed. Tenant, on behalf of itself and its successors, assigns, affiliates, owners, employees, agents, attorneys, and representatives, hereby releases Landlord, and each of its successors, assigns, affiliates, owners, employees, attorneys, insurers and representatives from any and all claims, demands, debts, disputes, judgments, liabilities, liens, rights and causes of action of any kind whatsoever, whether legal or equitable, whether contingent or non-contingent, and whether known or unknown, that arose or occurred on or before the Effective Date, including, but not limited to, all claims or counterclaims that could have been raised with respect to the Rental Arrearage, or that may have arisen in any way whatsoever from the Parties' relationship, the Leases, and/or the Premises. Tenant hereby ratifies the provisions of the Leases on behalf of itself and its successors and assigns and agrees to attorn and be bound to Landlord and its successors and assigns as to all of the terms, covenants and conditions of the Leases, as supplemented hereby. Tenant further agrees to fulfill all of its obligations under the Leases, as supplemented hereby, to Landlord throughout the remainder of the Term, including the Extended Term, of the Leases.

8.     **Force Majeure**. Landlord and Tenant acknowledge and agree that Tenant's Minimum Gross Revenue Obligations constitute a monetary term, covenant, and condition under this Letter Agreement and the Leases. The Force Majeure provisions of the Rooftop Leases are amended to provide that if Tenant is delayed or prevented from performing its Minimum Gross Revenues monetary obligation under Section 6(c) of this Letter Agreement due to a Force Majeure Event (as defined below), Landlord's recapture remedy for Tenant's failure to meet Minimum Gross Revenues under Section 6(d) shall be extended by two months so that Tenant shall have a 14-month trailing period to measure Tenant's 12-month Minimum Gross Revenues (which is measured on a trailing basis). This 14-month trailing period to measure Tenant's 12-month Minimum Gross Revenues shall only apply if the Force Majeure Event occurred during the trailing twelve (12) month period serving as the basis for the Minimum Gross Revenues Default. A

10

#232521v19

"**Force Majeure Event**" means governmental laws or regulations not in effect as of the Effective Date, riots, terrorist acts, or government orders beyond the reasonable control of Tenant that prevent Tenant from operating the Rooftop Premises. Notwithstanding anything herein or in the Leases to the contrary, in no event shall a Force Majeure Event serve to (x) excuse the timely payment of Rent or any other financial obligation under this Letter Agreement and the Leases; or (y) limit Landlord's default, recapture and termination remedies except as explicitly provided in this Section 8.

9.      **Authority**. The person executing this Letter Agreement on behalf of Tenant does hereby personally represent and warrant that: (a) Tenant is comprised of duly formed and validly existing limited liability companies; (b) Tenant is qualified to do business in the State of Georgia; (c) Tenant has the full right, power and authority to enter into this Letter Agreement; and (d) the person signing on behalf of Tenant is authorized to do so without the need of any third-party consents. Upon Landlord's request, Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing representations and warranties.

10.      **Broker**. No broker has represented Landlord or Tenant in this transaction. No broker shall be paid a commission by Landlord in connection with this Letter Agreement. Each party agrees to indemnify the other party against all costs, expenses, attorneys' fees or other liability for commissions or other compensation or charges claimed by any broker or agent claiming the same by, through or under such party.

11.      **Miscellaneous**. This Letter Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to the State's choice-of-law rules, and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. In the event of any inconsistency or conflict between the terms of this Letter Agreement and of the Leases, the terms of this Letter Agreement shall control. Time is of the essence of all of the terms of this Letter Agreement. This Letter Agreement constitutes and contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof. This Letter Agreement may not be changed, modified, discharged or terminated orally in any manner other than by an agreement in writing by Tenant and Landlord or their respective representatives, successors and permitted assigns. This Letter Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute but one and the same instrument. A facsimile or electronic signature hereon shall have the same force and effect as an original.

[*signatures appear on following page*]

11

#232521v19

**IN WITNESS WHEREOF**, the parties have caused this Letter Agreement to be duly authorized, executed, sealed and delivered as of the Effective Date.

**LANDLORD:**

**JAMESTOWN PONCE CITY MARKET, L.P.,**
a Delaware limited partnership

By:    JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:    JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _William Morgan_
                Name: _William Morgan_
                Its: Authorized Person

**JAMESTOWN PCM MASTER TENANT, L.P.,**
a Delaware limited partnership

By:    JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:    JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _William Morgan_
                Name: _William Morgan_
                Its: Authorized Person

**ROOFTOP TENANT:**

**SLATER RESTAURANT, LLC,**
a Georgia limited liability company

By: _____
Name: _____
Title: _____

**SLATER PARK, LLC,**
a Georgia limited liability company

By: _____
Name: _____
Title: _____

12

#232521v19

**IN WITNESS WHEREOF**, the parties have caused this Letter Agreement to be duly authorized, executed, sealed and delivered as of the Effective Date.

**LANDLORD:**

**JAMESTOWN PONCE CITY MARKET, L.P.,**
a Delaware limited partnership

By:    JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:    JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _____
                Name: _____
                Its: Authorized Person

**JAMESTOWN PCM MASTER TENANT, L.P.,**
a Delaware limited partnership

By:    JT PCM GP, L.P.,
        A Delaware limited partnership,
        its general partner

        By:    JT Ponce City Market GP, LLC,
                a Georgia limited liability company,
                its general partner

                By: _____
                Name: _____
                Its: Authorized Person

**ROOFTOP TENANT:**

**SLATER RESTAURANT, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: Member_____

**SLATER PARK, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: Member_____

12

#232521v19

**TOWER/TERRACE TENANT:**

**SLATER HOSPITALITY, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: _Member_____

**OFFICE LICENSEE:**

**SLATER HOSPITALITY, LLC,**
a Georgia limited liability company

By: _Kelvin Slater_____
Name: _____
Title: _Member_____

**GUARANTORS ACKNOWLEDGE AND AGREE**

Kelvin Slater and Amanda Slater hereby join in the execution of this Letter Agreement for purposes of evidencing their consent to the terms hereof and to acknowledge and affirm their joint and several guaranty obligations under the Leases, as amended by this Letter Agreement.


_Kelvin Slater_____
Kelvin Slater, individually


_Amanda Slater_____
Amanda Slater, individually


13

#232521v19

**EXHIBIT A**

14

#232521v19

| Rent Schedule - Existing Lease | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | 9/1/2025 | 10/1/2025 | 11/1/2025 | 12/1/2025 | 1/1/2026 | 2/1/2026 | 3/1/2026 | 4/1/2026 | 5/1/2026 | 6/1/2026 | 7/1/2026 | 8/1/2026 | 9/1/2026 | 10/1/2026 | 11/1/2026 | 12/1/2026 |
| RFD Social Base Rent [1] | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $30,746.75 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $31,669.15 | $32,619.22 | $32,619.22 |
| Rooftop Terrace Base Rent [2] | $30,746.85 | $30,746.85 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $31,669.25 | $32,619.33 | $32,619.33 | $32,619.33 | $32,619.33 | $32,619.33 | $33,597.91 | $33,597.91 |
| Nine Mile/Skyline Base Rent [3] | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $79,173.13 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $81,548.33 | $83,994.78 | $83,994.78 |
| Deferral Rent | | | | | | | $21,024.94 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | $21,024.74 | | |
| Slaters Management Office [4] | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,101.75 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 | $8,275.86 |
| **Total** | **$148,768** | **$148,768** | **$149,691** | **$149,691** | **$149,691** | **$149,691** | **$170,716** | **$173,091** | **$173,091** | **$174,187** | **$174,187** | **$174,187** | **$174,187** | **$174,187** | **$175,137** | **$175,137** | **$175,137** | **$175,137** | **$154,113** | **$158,488** | **$158,488** |

*(1) Rent escalates in January each calendar year.*

*(2) Rent escalates in June each calendar year.*

*(3) Rent escalates in November each calendar year.*

*(4) Rent escalates in January each calendar year.*

## EXHIBIT B

Proposed Rooftop Improvement Plans

Tenant's submission of a proposed plan to Landlord for the requested Rooftop improvements shall include the following:

Construction/Engineering:
- Project Scope: A clear description of the project, including goals, materials, and expected results.
- Cost Estimates: A breakdown of the estimated costs, including materials, labor, and permits. Three bids will be required for projects over $50,000.00.
- Timeline: A detailed timeline with key milestones and completion dates.
- Contracts: Draft contracts with any contractors or vendors involved that must include back up for costs and proof of insurance.
- Progress Reports: Dates for regular updates on the status of the project, with photos and descriptions.

Marketing:
- Project Justification: How the project fits in with Tenant's marketing goals.
- Marketing Plan: What marketing activities Tenant is planning around the project, including budget and expected ROI.
- Progress Reports: Dates for updates on marketing efforts and the outcomes.

Property Management:
- Impact Assessment: How the project will affect property operations and customer experience.
- Maintenance Plan: How Tenant plans to maintain the project after it's done.

**Signature:** *Kelvin Slater*
Kelvin Slater (May 1, 2025 14:26 EDT)
**Email:** kfslater@slaterhospitality.com

**Signature:** *Amanda Slater*
Amanda Slater (May 1, 2025 14:31 EDT)
**Email:** mslater@slaterhospitality.com

15

#232521v19

# Jamestown-Slater FINAL Letter Agreement (April 2025)(232521.21)

Final Audit Report                                                    2025-05-01

| | |
|---|---|
| Created: | 2025-04-30 |
| By: | ceci christy (ceci30327@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAZL9ejk2cEe0zYalDbYqjJyBee7SMBNuf |

## "Jamestown-Slater FINAL Letter Agreement (April 2025)(232521 .21)" History

🗎 Document created by ceci christy (ceci30327@gmail.com)
2025-04-30 - 10:14:08 PM GMT

🖾 Document emailed to Kelvin Slater (kfslater@slaterhospitality.com) for signature
2025-04-30 - 10:14:13 PM GMT

🖾 Document emailed to Amanda Slater (mslater@slaterhospitality.com) for signature
2025-04-30 - 10:14:13 PM GMT

🗎 Email viewed by Amanda Slater (mslater@slaterhospitality.com)
2025-05-01 - 2:56:46 PM GMT

🗎 Email viewed by Kelvin Slater (kfslater@slaterhospitality.com)
2025-05-01 - 6:23:57 PM GMT

✍ Document e-signed by Kelvin Slater (kfslater@slaterhospitality.com)
Signature Date: 2025-05-01 - 6:26:40 PM GMT - Time Source: server

✍ Document e-signed by Amanda Slater (mslater@slaterhospitality.com)
Signature Date: 2025-05-01 - 6:31:43 PM GMT - Time Source: server

✅ Agreement completed.
2025-05-01 - 6:31:43 PM GMT

![Adobe Acrobat Sign logo] **Adobe Acrobat Sign**